UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| KIMBERLY CARTER, et al., | Case No.  13-cv-00809-JCS |
| Plaintiffs, | |
| v. | **ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** |
| NATIONAL RAILROAD PASSENGER CORPORATION, et al., | |
| Defendants. | Re: Dkt. No. 118 |

## I.      INTRODUCTION

This case involves the tragic death of Gary Carter, who was struck and killed by a passenger train on December 3, 2011.  In this action, his wife and minor child assert wrongful death and survivor claims against National Railroad Passenger Corp. ("Amtrak") and Union Pacific Railroad Company ("Union Pacific") arising out of the death of their husband/father.[1] Amtrak and Union Pacific now bring a Motion for Summary Judgment, or, in the Alternative, Partial Summary Judgment ("Motion").  A hearing on the Motion was held on August 1, 2014. For the reasons stated below, the Motion is GRANTED in part and DENIED in part.[2]

## II.      BACKGROUND

### A.      Facts

#### 1.  Events of December 3, 2011

On the morning of December 3, 2011, Gary Carter drove himself and his three dogs to the Silliman Sports Complex, in Newark California, near Mowry Avenue and Stevenson Boulevard.

---

[1] Although the First Amended Complaint named several other defendants, all of the defendants except Amtrak and Union Pacific have been dismissed from this action.
[2] The parties have consented to the jurisdiction of the undersigned United States magistrate judge pursuant to 28 U.S.C. § 636(c).

United States District Court
Northern District of California

United States District Court
Northern District of California

1  Declaration of Kimberly Carter in Opposition to Defendants' Motion for Summary Judgment

2  ("Carter Decl."), ¶¶ 2, 9.   He and his wife Kimberly, along with their son Grant, frequently

3  walked in a nearby nature area, often with their three dogs.  *Id.*, ¶ 2;  Declaration of Scott O.

4  LaFranchi in Support of Defendant Union Pacific Railroad Company and National Railroad

5  Passenger Corporation's Motion for Summary Judgment ("LaFranchi Decl."), Ex. A (K. Carter

6  Dep.) at 25-26 (testimony  by Kimberly Carter that she and her husband had gone to this area to

7  walk the dogs approximately 300 times and that Grant had come along about 150 to 200 of those

8  times).  According to Kimberly Carter, when they went to the nature area they always parked at

9  the Silliman Sports Complex parking lot, by two palm trees at the end of a long gravel section of

10  the lot that runs along a baseball and soccer field on the east and the railroad track on the west.

11  Carter Decl., ¶ 3 & Ex. 1(A).[3]

12       It is undisputed that Mr. Carter walked from his car to the area of impact, which occurred

13  approximately 508 feet south of the Stevenson Boulevard private grade crossing.  Joint Statement

14  of Undisputed Material Facts ("JSUMF"), No. 2.   According to Kimberly Carter, her husband

15  would have walked the way they had always walked, heading south on a trail that began near their

16  regular parking spot, walking for a short distance alongside the track on that trail and then turning

17  right onto a "worn, beaten path" across the railroad tracks.  Carter Decl., ¶¶ 5-7 & Ex. 1(B-E);  *see*

18  *also* Declaration of Jennifer L. Fiore in Support of Plaintiffs' Opposition to Defendants' Motion

19  for Summary Judgment ("Fiore Decl."), Ex. 1 (K. Carter Dep.) at 30.  After crossing to the west

20  side of  the  railroad tracks, Mr. Carter likely would have walked on a dirt road that ran parallel to

21  the tracks, crossing a wooden bridge that was the only bridge across a channel.  Carter Decl., ¶ 8

22  & Ex. 1 (G-H).

23

24  [3] Plaintiffs have offered aerial photographs of the parking lot and paths, attached as Exhibit 1 to
    the Carter Declaration.  In the Reply brief at 5, Defendants object to the aerial photographs under
25  Fed.R. Evid. 901 and 902 on the basis that Kimberly Carter did not take these photographs and
    therefore cannot authenticate them.  Defendants also contend the photographs appear to be date
26  stamped with 2013 and 2014 dates (whereas the relevant events took place in 2011).  Similarly,
    Defendants object to close-up photographs that are attached to the Carter Declaration on the basis
27  that Mrs. Carter does not identify the person who took these photographs or the dates on which
    they were taken.  Because there is uncontroverted evidence in the record describing the layout of
28  the parking lot, nature area and adjacent paths, as well as the worn path that crossed the railroad
    tracks, the Court need not reach Defendants' objections.

The raw data from the Amtrak train that struck and killed Mr. Carter was recorded on the train's event recorder ("Event Recorder").   *See* Declaration of Leo Caniezo in Support of Union Pacific Railroad Company and National Railroad Passenger Corporation's Motion for Summary Judgment ("Caniezo Decl."), ¶ 2-3;  *see also* Declaration of Foster J. Peterson in Support of Union Pacific Railroad Company and National Railroad Passenger Corporation's Motion for Summary Judgment ("Peterson Decl."), ¶¶ 2-4 & Ex. A (Data Table created using Wabtec Railway Electronics Data Analysis Software ("DAS"), translating raw data from event recorder).[4]  Amtrak also installs video cameras on the front of its trains and thus, there is video footage that shows some of what occurred that day.  Caniezo Decl., ¶ 4 (establishing chain of custody for video); Declaration of Clyde Moore, II in Support of Defendants National Railroad Passenger Corporation and Union Pacific Railroad Company's Motion for Summary Judgment ("Moore Decl."), Ex. A (copy of video downloaded from Amtrak locomotive involved in incident for December 3, 2011 ("Locomotive Video")).   Nonetheless, many of the basic facts about the events that occurred in the last moments before impact, particularly with respect to timing, are in dispute. [5]  For example, the parties' experts do not agree on whether the train operator applied the brakes *before or after* striking Mr. Carter.  *See* Motion at 4 (stating that Lobato applied the brakes approximately 3 seconds before impact (citing Declaration of Brian P. Heikkila in Support of Defendant Union Pacific Railroad Company and National Railroad Passenger Corporation's Motion for Summary Judgment ("Heikkila Decl."), Ex. A (Heikkila preliminary expert witness report ("Heikkila Report")) §§ 3.5, 3.9)); *but see* Opposition at 5 (stating that "Lobato and Battles did not apply any braking mechanism until after striking Mr. Carter and his dog" (citing Declaration of Paul Byrnes Submitted in Opposition to Defendants' Motion for Summary Judgment ("Byrnes Decl."), ¶¶ 8, 20)).

The general outline of the relevant events is as follows:   the Amtrak train that struck Mr.

---

[4] At oral argument, Plaintiffs stipulated that the Data Table accurately reflects the raw data from the Event Recorder.

[5] Prior to the motion hearing, the parties stipulated to just one fact relating to the events that occurred just before impact– that  the train was travelling at a speed of 63 miles per hour or less at all relevant times.  JSUMF No. 7.

United States District Court
Northern District of California

Carter was travelling southbound, having already passed the Mowry Crossing; it was approaching the Mowry Control Point and switch (which were south of the Mowry crossing) and beyond that, the Stevenson Crossing.  *See* Byrnes Decl., ¶ 6; FioreDecl., Ex. 3 (Lobato Dep.) at 34-35; Fiore Decl., Ex. 7 (Battles Dep.) at 32-33.  The train passed a whistle board (which tells the crew of a train travelling over 45 mph to begin sounding the horn for a train crossing, *see* Byrnes Decl., ¶6) that was approximately a quarter mile north of the Stevenson Crossing, and at that point the crew began to sound the horn.  *Id.* The train proceeded through the Stevenson Crossing and continued to travel southbound.  *Id.*

Mr. Carter, in the meantime, had already crossed the tracks from the east side of the tracks (where he was parked, near the Silliman Sports Complex) to the west side of the tracks (where the open-space nature area was located) and was walking with his three dogs along the dirt road that ran parallel to the tracks.  *See* Carter Decl., ¶¶ 3-8.  Engineer Lobato testified that he first saw Mr. Carter and a large dog "walking between the gauge of the tracks" "sometime between the whistle board and the [Stevenson] crossing."  LaFranchi Decl., Ex. B (Lobato Dep.) at 34.  He  further testified that as he was approaching the crossing he saw "the gentleman and the dog walk off to my left, off the . . . tracks, clear of the tracks, and then as [the train] passed the crossing, [he] saw the gentleman start walking back up on to the tracks and – bending over to . . . pick up a smaller dog."  *Id.*; *see also* Fiore Decl., Ex. 7 (Battles Dep.) at 56-58 (testifying that before passing through the Stevenson crossing Battles saw Mr. Carter between the gauge of the track and then, within 5 to 10 seconds Mr. Carter moved off the tracks).  The parties disagree as to how many seconds before impact Mr. Carter returned to the tracks to save the dog that was still on the tracks. *See* Motion at 4 (stating that Mr. Carter returned to the tracks 3 seconds before impact (citing Heikkila Decl., Ex. A (Heikkila Report), §§ 3.2, 3.7, Locomotive Video and Event Recorder); Opposition at 4 (stating that Mr. Carter returned to the tracks "at least five seconds before impact" (citing Byrnes Decl., ¶ 20)).

At some point before impact (how many seconds before impact is disputed) Lobato sounded an emergency horn to warn Mr. Carter of the oncoming train.  Byrnes Decl., ¶ 15 (stating that emergency horn was sounded 1-2 seconds before impact); Reply at 16 n. 12 (citing Event

1   Recorder Data Table) in support of assertion that emergency horn was sounded "at least 6 seconds

2   before impact").

3        Both Mr. Carter and his dog were struck and killed.

### 2.   Area Where the Events Occurred

5        The area at issue in this case runs from the Mowry Avenue Crossing, at approximately

6   Mile Post ("MP") 33.23 to approximately MP 34, which is "a moderate distance compass point

7   south of the Stevenson Boulevard crossing."  Declaration of Dale Bray in Support of Defendants

8   National Railroad Passenger Corporation and Union Pacific Railroad Company's Motion for

9   Summary Judgment ("Bray Decl."), ¶ 22 (describing this area as the "Subject Area").[6]  It is

10  undisputed that the incident occurred on Union Pacific's Coast Subdivision on tracks owned by

11  Union Pacific.  JSUMF, No. 3.  It is also undisputed that Amtrak does *not* own any of the tracks or

12  right of way in this area.  *Id.*

13       Defendants have presented evidence that this area is "a relatively remote and industrial

14  location with almost no residential and only limited commercial activity in the surrounding

15  properties."  Bray Decl., ¶ 5.  Further, according to Union Pacific patrolman Dale Bray, Union

16  Pacific has taken an "aggressive approach to the issue of trespassing" and "does not allow people

17  on its right of way in the Subject Area without express permission and authorization."  *Id.*, ¶ 3.

18  Bray states that prior to the incident, Union Pacific's Police Department employed special agents

19  to remove trespassers from its rights of way and also engaged in public outreach "dealing with the

20  issue of trespassing on railroad property."  *Id.*, ¶ 4.  He further states that he reviewed the records

21  of the Union Pacific Police Department for the period between January 1, 2009 and December 31,

22  2011, and that based on his review, he could attest that there "was minimal reporting of trespasser

23  activity in the Subject Area and *no* instances of a trespasser vs. train incident."  *Id.*, ¶ 5.  Finally,

24  he states that Union Pacific "managed the Subject Area in a manner consistent with its historical

25  approach to aggressively and proactively addressing the issue of trespassing on its property."  *Id.*,

26

27   ─────────────────
[6] While Defendants do not dispute that Union Pacific owns the railroad track and right-of-way in
28  this area, they *do not* concede that Union Pacific owns or controls the paths and dirt roads on
    either side of the railroad track.  *See* Reply at 6 n. 6.

United States District Court
Northern District of California

¶ 6.

In contrast, Kimberly Carter testified that she and her husband saw people (some with dogs off leash) walking in this area – and crossing the tracks – "all the time." Fiore Decl., Ex.1 (K. Carter Dep.) at 60.  She testified that there was trash and debris along the tracks in this area, and that the weeds and other vegetation were worn down from people walking over them.  *Id*. at 59-60, 62.  She also states that there was no gate at the trailhead adjacent to their regular parking spot and that there was no fence or warning signs (including "no trespassing" signs) at the trailhead or along the path.  Carter Decl., ¶¶ 2, 5.  When the Carters went hiking in the nature area, they frequently saw freight and passenger trains running along the tracks.  LaFranchi Decl., Ex. A (Carter Dep.) at 65-66.  However, Mrs. Carter testified that she and her husband had never been told they were trespassing when they walked along the paths near the railroad track and that because "everyone else was out there walking and using the area" they had no understanding that they were trespassing.  *Id*. at 64.

The Amtrak engineer who operated the train that struck Gary Carter, Michael Lobato, testified that it was not unusual to see people walking in this general area and that he had seen people walking in the area at least 50 times.  Fiore Decl., Ex. 3 (Lobato Dep.) at 55-58.  However, he also testified that he had not seen people walking dogs in the area just beyond the Stevenson crossing, where Mr. Carter was struck.  Declaration of Scott O. LaFranchi in Support of Defendant Union Pacific Railroad Company and National Railroad Passenger Corporation's Reply Brief on their Motion for Full or Partial Summary Judgment ("LaFranchi Reply Decl."), Ex. A (Lobato Dep.) at 55-56.  He further testified that he had never reported to Union Pacific that he had seen people walking near the tracks in the "general area past Mowry crossing."  *Id*. at 57.

### 3.  Amtrak Crew's Alleged Failure to Adhere to Rules and Standards Governing Horn Operation

Plaintiffs present evidence they contend shows that the train crew did not properly sound the horn in the moments before impact.  The sequence of horn blasts preceding impact is described by Plaintiffs' expert as follows:

the horn was sounded at the whistle board in a one second blast

> followed with five seconds of silence before it was sounded again in a blast that lasted less than one second. The second blast was followed by another five seconds of silence before two short blasts were sounded in one second, as the train reached the Stevenson Crossing. After accelerating through the crossing, the train sounded two short blasts before striking Gary Carter.

Byrnes Decl., ¶ 7. According to Byrnes, "[h]orn blasts that only last one second or less may not reach the required decibel level and fail to adequately alert vehicle operators and pedestrians at or near the right-of-way of the presence of an approaching train." *Id.*, ¶ 9.

Defendants' expert opines that the "duration of the warning horn sequence prior to impact was approximately 18 seconds" but does not describe the sequence of blasts that was sounded. Heikkila Decl., Ex. A (Heikkila Report), § 3.5. According to Lobato, the sequence he used was as follows: two seconds for the first long blast, one second for the gap, two seconds for the second long blast, one second for the gap, one second for the short, one second for the gap and two seconds for the final long. Opposition at 6 (citing Fiore Decl., Ex. 3 (Lobato Dep.) at 47-48. Plaintiffs assert that the testimony of engineer Lobato establishes that the crew did not adhere to the horn requirements for approaching a crossing to the extent he testified that he sounded the horn in a series of bursts that lasted a total of only 10 seconds rather than the required 15-20. Opposition at 6 (citing Fiore Decl., Ex. 3 (Lobato Dep.) at 47-48. Further, at oral argument Defendants conceded that all of the horn blasts sounded between the whistle board and the point of impact were, in fact, short blasts.

In support of their assertion that the Amtrak crew did not sound the proper horn sequence, Plaintiffs cite various rules and regulations. First, Plaintiffs cite Section 5.8.2 of the General Code of Operating Rules ("GCOR"), which is entitled "Sounding Whistle." That provision provides that the "whistle may be used as a warning regardless of any whistle prohibitions." Byrnes Decl., Ex. 2, Section 5.8.2. It also specifies that "when persons or animals are on the track at other than road crossings" a "[s]uccession of short sounds" should be used. *Id.* Section 5.8.2 further provides that when a train is approaching a crossing at a speed in excess of 45 mph, it should sound the horn in a long, long, short, long sequence; the horn sequence should be initiated no more than a quarter mile before the crossing and should be prolonged or repeated until the engine

completely occupies the crossing.  *Id.*  The cover page of GCOR states that "[t]he rules herein govern the operations of the railroads listed and must be complied with by all employees . . . ."  *Id.*  According to Plaintiffs, both Amtrak and Union Pacific have adopted GCOR.  Byrnes Decl., ¶ 10.

Plaintiffs also cite a Federal Railroad Administration ("FRA") regulation entitled "When must a locomotive horn be used?"  Fiore Decl., Ex. 6 (49 C.F.R. § 222.21).  That provision, like GCOR Section 5.8.2, requires that a locomotive must sound its horn when it is approaching a public crossing in a long, long, short, long sequence.  *Id.*  Under Section 222.21, the horn sequence used as a train approaches a public crossing should begin to be sounded between 15 and 20 seconds before the engine reaches the crossing, except that it is not a violation for an engineer to wait to sound the horn until the train is within a quarter mile of the crossing when the train is travelling at speeds in excess of 60 mph, even if waiting to sound the horn until the quarter mile mark will result in less than 15 seconds advance warning.  *Id.*  A further regulation cited by Plaintiffs is entitled, "How does this regulation affect sounding of a horn during an emergency or other situations?"  Opposition at 7 (citing 49 C.F.R. § 222.23).  This regulation provides, *inter alia*, that "[n]otwithstanding any other provision of this part, a locomotive engineer may sound the locomotive horn to provide a warning to animals, vehicle operators, pedestrians, trespassers or crews on other trains in an emergency situation if, in the locomotive engineer's sole judgment, such action is appropriate in order to prevent imminent injury, death, or property damage."  Finally, Plaintiffs cite 49 C.F.R. § 214.339, which requires that "[e]ach railroad shall require that the locomotive whistle be sounded, and the locomotive bell be rung, by trains approaching roadway workers on or about the track."  *Id.*

With respect to the sequence that should be used as a train approaches a crossing, Plaintiffs also cite testimony of William Bryant and David Engman that Amtrak and Union Pacific engineers are required under the operating rules to sound the horn in a long, long, short, long sequence when approaching a crossing.  *See* Opposition at 5 (citing Fiore Decl., Ex. 9 (Engman Dep.) at 66-67 & Ex. 15 (Bryant Dep.) at 19-20).   Bryant further testified that the duration of the sequence that is initiated in advance of public crossings should be approximately fifteen to twenty seconds, "depending on the speed."  Fiore Decl., Ex. 15 (Bryant Dep.) at 19.  Bryant testified that

United States District Court
Northern District of California

1   the sequence used by the automatic horn sequencer that is installed on many Amtrak trains

2   (including the one at issue in this case) and can be activated by pushing a pedal, would be an

3   "appropriate" horn sequence under the railroad standards cited above.  *Id*. at 20; *see also* Fiore

4   Decl., Ex. 7 (Battles Dep.) at 101 (stating that locomotive had an automatic sequencer and that the

5   pedal to activate it was located by the engineer's right foot).  The automatic horn sequencer

6   sounds the long, long, short, long sequence with the long bursts lasting 4 to 5 seconds and the

7   short burst lasting about 2 seconds.  Fiore Decl., Ex. 15 (Bryant Dep.) at 20.

8        Plaintiffs also contend the crew did not sound an emergency horn – the succession of short

9   bursts described in GCOR Section 5.5.2 – until one or two seconds before the train struck Mr.

10   Carter.  Opposition at 7 (citing Byrnes Decl., ¶ 15).  According to Byrnes, the succession of short

11   sounds used for emergencies is "a very effective means for a locomotive engineer to alert people

12   and animals."  Byrnes Decl., ¶ 15.  Mr. Byrnes further opines that "[i]f the emergency horn pattern

13   had been continuously sounded from the time Mr. Carter and/or the dogs on or about the track first

14   became visible on the morning of the incident, it is more likely than not Mr. Carter and his dogs

15   would have received the required warning with sufficient time to react to it."  *Id.*

16        Plaintiffs also offer the opinions of Brad Mathison, a forensic visualization expert, on the

17   importance of using the proper horn sequence.  *See* Declaration of Brad Mathison Submitted in

18   Opposition to Defendants' Motion for Summary Judgment ("Mathison Decl.").  Mr. Mathison

19   explains that it is difficult for a person to determine the speed of an approaching train when it is

20   moving directly toward him on the tracks because depth perception is diminished due to "the lack

21   of angle to the eye."  Mathison Decl., ¶ 8.  Conversely, he states, the "sound level of a train's horn,

22   if sounded properly, will increase dramatically as it approaches a pedestrian."  *Id.*, ¶ 9.  Mathison

23   tested the horn on the train that hit Mr. Carter and found that while the horn did comply with the

24   "FRA horn output requirements," the "reduced output caused by short blasts was sufficient to drop

25   the horn output below the FRA minimum requirements."  *Id.*, ¶ 14.

26            **4.  Amtrak Crew's Alleged Failure to Properly Apply Emergency Brake**

27        Plaintiffs present evidence they contend shows that the train crew did not properly apply

28   the emergency brakes in the moments before impact, instead accelerating until the moment of

United States District Court
Northern District of California

impact or just seconds before.  With respect to the speed of the train during the relevant period,

Mr. Byrnes (Plaintiff's expert) opines, based on the Event Recorder data and the Locomotive

Video, that the train was travelling at 56 mph when it passed the whistle board and that it

continued to accelerate until the point when it struck Mr. Carter, reaching a speed of 63 mph.

Byrnes Decl., ¶ 22.  Although Defendants contend the brakes were applied a few seconds *before*

impact, they do not dispute that up until that point the train was accelerating; according to

Defendants, the train was travelling at 62 mph when the emergency brake was applied.  *See*

Motion at 4 (citing Heikkila Decl., Ex. A (Heikkila Report) § 3.7).

In support of their contention that Defendants acted improperly as to the use of the

emergency brake, Plaintiffs cite what they contend is the "railroad industry standard of care" as

well as GCOR Section 1.47(3).  According to Plaintiffs' expert, "[t]he railroad industry standard

of care (including Union Pacific's Air Brake and Handling Rules), is that train crew members are

instructed and required to initiate an emergency brake application without hesitation if life or

property is in danger."  Byrnes Decl., ¶ 16 & Ex. 3 (excerpts of Air Brake and Train Handling

Rules for various railroad companies, including Union Pacific).  According to Byrnes, "[t]he

reason that the railroad industry standard of care requires train crew members to initiate an

emergency brake application any time that life is in danger – such as when a collision with a

pedestrian is imminent – is because doing so is the fastest way to stop the train and may slow it

enough to provide the threatened person(s) enough time to reach a place of safety."  *Id*., ¶ 18.

Plaintiffs also cite GCOR Section 1.47(c)(3).[7]  That section provides that "[w]hen the engineer

and/or conductor fail to comply with a signal indication or take proper action to comply with a

restriction or rule, crew members must immediately take action to ensure safety, using the

emergency brake valve to stop the train, if necessary."  Byrnes Decl., Ex. 2 (GCOR), Section

1.47(c)(3).

Plaintiffs' expert opines that when Lobato and Battles first saw Mr. Carter – Battles

testified he saw Carter somewhere between the Mowry Control Point and the Stevenson Crossing,

---

[7] In their Opposition brief, Plaintiffs erroneously cite GCOR Section 1.47(3).   In the Byrnes
Declaration, the provision on which Plaintiffs rely is properly cited as Section 1.47(c)(3).

United States District Court
Northern District of California

while Lobato said he saw Mr. Carter between the whistle board and the Stevenson Crossing – "a collision was imminent and the train crew could have and should have initiated an emergency brake application without hesitation."  Byrnes Decl., ¶ 18; *see also* Fiore Decl., Ex. 3 (Lobato Dep.) at 51-52 & Ex. 7 (Battles Dep.) at 58.  Byrnes further opines that Lobato "fell below industry standards by failing to place the train in emergency until after impact."  *Id*.  Byrnes' opinion that the brakes were not applied until after impact is based on his observation that in the video, "the sound of the air exhausting from the air brake reservoirs can be hear after impact."  *Id*., ¶ 19.  Byrnes further states that "the event data recorder download is consistent with the video in showing the train was not placed in emergency until after impact."  *Id*.  In Byrnes' opinion, the video shows that Mr. Carter went back to get his dog off the tracks about five seconds before impact and at that time, both Lobato and Battles had an obligation to apply the emergency brake.  *Id*., ¶ 20.  Instead, according to Plaintiffs, Battles testified that he did not believe he had an obligation to stop to avoid hitting the dog, even though he also testified that it was not surprising that Mr. Carter went back to get his dog because some dogs are like family members.  Opposition at 8 (citing Fiore Decl., Ex. 7 (Battles Dep.) at 64-65, 70).  Plaintiffs also cite Battles' testimony that when he saw Mr. Carter go back for his dog, he considered hitting the brake but did not do so.  *Id*. (citing Fiore Decl., Ex. 7 (Battles Dep.) at 60).   Battles also testified, "I vividly remember saying 'do not go back for that dog' just as he went back for the dog.'"  *Id*. at 63.  And Plaintiffs cite testimony by Battles suggesting he believed that because Mr. Carter was a trespasser there were no specific requirements other than sounding the horn.  *Id*. (citing Fiore Decl., Ex. 7 (Battles Dep.) at 65-66).

In support of their assertion that the crew should have applied the emergency brake, Plaintiffs also cite evidence of what they contend was "commonly known to the Defendant railroads" before this incident."  Opposition at 9.  First, Plaintiffs cites Operation Lifesaver, an industry education program created in 1972 by the railroad industry.  Opposition at 9-10 (citing Byrnes Decl., ¶ 21; Declaration of William Hughes Submitted in Opposition to Defendants' Motion for Summary Judgment  ("Hughes Decl.), ¶¶ 15-19 & Exs. 2-3).  According to Plaintiffs, statements made in Operation Lifesaver brochures constitute admissions that Defendants were

aware that the safe distance from the nearest rail of a railroad track is 25 feet and that an approaching train is always closer and moving faster than it appears.  *Id.* at 9-10.  Plaintiffs also cite Union Pacific rules that require workers to stay at least 25 feet from the tracks.  Opposition at 10 (citing Hughes Decl., ¶¶ 20-21 & Ex. 4 (Maintenance-of-Way Rule 42.10, State of Nebraska Department of Roads Addendum No. 1 and Union Pacific Railroad Company Fiber Optic Engineering, Construction and Maintenance Standards 3.4.2); Byrnes Decl., ¶ 21).  Because the crew knew or should have known Mr. Carter was within 25 feet of the tracks and because they did not know if Mr. Carter was going to get out of the way, Plaintiffs contend, they should have sounded the emergency horn and applied the emergency brake.  Opposition at 10 (citing Byrnes Decl., ¶ 21).

Plaintiffs also cite testimony of Battles and Lobato that they did not see Mr. Carter's third dog.  Opposition at 9 (citing Fiore Decl., Ex. 7 (Battles Dep.) at 95 & Ex. 3 (Lobato Dep.) at 36).  According to Plaintiffs, this is evidence that the crew was not keeping a proper lookout.  *Id.*  More generally, Plaintiffs' expert opines that to the extent that there was an unobstructed view of a pedestrian standing on or near the tracks from over a quarter of a mile away, the fact that the train continued to accelerate and was not put into emergency until impact indicates that Lobato and Battles failed to provide a proper lookout.  Byrnes Decl., ¶ 23.

### 5.   Amtrak's Alleged Failure to Adequately Train and Supervise Employees

Plaintiffs contend Amtrak did not promote and require compliance with the federal safety regulations discussed above.  Opposition at 10-13; Byrnes Decl., ¶¶ 24-25.  According to Plaintiffs, under 49 CFR §§ 217.1 and 217.11 Amtrak must instruct, test, and promote/require compliance with its operating rules.  Byrnes Decl., ¶ 24. Plaintiffs also contend federal regulations require that Amtrak: 1) have procedures for testing its engineers' knowledge of its rules and practices for safe train operation (49 C.F.R. § 240.127(b);  2) monitor the conduct and performance of its engineers (49 C.F.R. § 240.129(b));  and 3) have a program for responding to instances of poor safety conduct by engineers (49 C.F.R. § 240.309(a)).  *Id.*

In support of their contention that Amtrak did not meets its training and supervision obligations, Plaintiffs point to the following deposition testimony by Lobato and Battles:

12

Lobato

- Although prior to his employment with Amtrak (commencing in 1998 or 1999) Lobato had worked for seven years at Union Pacific, he did not remember a Union Pacific rule that required Union Pacific engineers to initiate emergency brake application life or property was in danger.  Fiore Decl., Ex. 3 at 8-9, 92.

- While Lobato was employed by Union Pacific he struck and killed 10-15 pedestrians.  *Id.* at 66.  Plaintiffs contend there is no evidence Lobato was ever disciplined or retrained after these incidents.  Opposition at 11. Plaintiffs further point to Lobato's testimony that he had been an Amtrak trainer for a number of years, including on the day of the accident.  *Id.* at 16.

- Lobato was never trained by Amtrak in how to handle a situation where someone is walking dogs along the tracks and was unaware of an incident in which the mayor of Del Mar had been killed by a train after running after his dog.  *Id.* at 72-74.

- No one had ever told Lobato that the long blasts should be 4-5 seconds each and the short blasts should be 1-2 seconds.  *Id.* at 29.

- Lobato did not know that there was a federal regulation that required that the horn begin to be sounded at least 15 seconds before a crossing.  *Id.* at 126-127.

- Lobato was never taught as to what the succession of short sounds referred to in GCOR Section 5.8.2(1) was supposed to be.  *Id.* at 50.

- Amtrak did not test Lobato for drugs or alcohol after Mr. Carter was killed.  *Id.* at 67-68.

Battles

- Battles had only been in the field in a train engine for a week and had only trained with Engineer Lobato.  Fiore Decl., Ex. 7 (Battles Dep.) at 7.

- Amtrak did not provide training on how to handle a situation involving a pedestrian or animals on the tracks, including whether to stop for a pedestrian.  *Id.* at 17, 19.

- Battles has hit one pedestrian since becoming an engineer in 2012 but he was not disciplined for the incident and has never heard of an engineer being disciplined for hitting a pedestrian.  *Id.* at 29.

- Amtrak trained Battles to use the long, long, short, long sequence when approaching crossings but did not train him as to the required duration of the short and long blasts.  *Id*. at 32, 83-85.
- Battles believed he did not have the authority to place the train in "emergency" even though (according to Plaintiffs) GCOR Sections 1.4, 1.47(c)(3) and 5.8.3 required that he do so if he saw that Lobato was doing something wrong.  Byrnes Decl., ¶ 25(e).[8]

Plaintiffs also cite as evidence of inadequate training and supervision the following evidence:

- Although Amtrak has a "Confidential Close Call Reporting Program" requiring that employees report close calls in the train yards where employees are almost hit, it does not have a policy on what distance from the tracks a trespasser must be before an engineer is supposed to report the trespasser.   Fiore Decl., Ex. 16 (Andrews Dep.) at 49, 55-56.
- Amtrak's training of engineers does not include teaching them to report trespassers and Amtrak does not know if Lobato was trained to report trespassers.  *Id*. at 33-34, 39. Further, after Mr. Carter's death, Amtrak did not make sure Lobato and Battles were told to report trespassers on the right-of-way.  *Id*. at 39.
- Amtrak does not require engineers to report trespassers unless they are putting themselves in harm's way.  *Id*. at 49-50.
-  Amtrak leaves it to the engineer's discretion when trespassers should be reported and has not told Union Pacific that it leaves reporting to the discretion of engineers.  *Id*. at 52-45. Plaintiffs also cite the testimony of Amtrak's Rule 30(b)(6) witness that he had not researched Union Pacific's requirements for reporting trespassers.  *Id*. at 53-54.

### 6. Union Pacific and Amtrak's Alleged Failure to Enforce Zero Tolerance Policy as to Trespassers

Plaintiffs have presented evidence that Union Pacific has a "zero tolerance policy" for allowing trespassers on its right-of-way.  *See* Opposition at 13 (citing  Fiore Decl., Ex. 28 (Bray Dep.) at 78-80, 89-90; Ex. 9 (Engman Dep.) at 32, 35-38, 55; Ex. 18 (June 11, 2014 Slaats Dep.)

---

[8] Byrnes refers to Battles' testimony but does not cite to the specific page of the Battles deposition.

at 11-14, 24-25, 45-46, 51, 52, 57; Ex. 25 (August 27, 2013 Slaats Dep.) at 17-19; Ex. 19 (July 20, 2001 News article); Ex. 20 (July 11, 2001 News article); Ex. 21 (Union Pacific Zero Tolerance Policy); Ex. 22 (Union Pacific Mandatory Duties); Ex. 23 (Union Pacific Monthly Police Report); Ex. 27 (Union Pacific SAIBRS database printout)).   According to William Hughes, an expert retained by Plaintiff, Union Pacific Safety Rule 70.10 provides that "Railroad Police must be advised of all unauthorized persons or trespassers on company property."  Hughes Decl., ¶ 7.  Hugh further states that Amtrak has zero tolerance for trespassers on the railroad right of way.  *Id.*; *see also* Fiore Decl., Ex. 9 (Engman testimony that if there is a "trespasser who is known to be on the right-of-way, it is mandatory that the Amtrak crews report them").

When Union Pacific receives a report of a trespasser on the right-of-way, it sends one of its own officers to the site or, if none is available, it alerts law enforcement in that jurisdiction.  Fiore Decl., Ex. 25 (August 27, 2013 Slaats Dep.) at 19-21.  Union Pacific also maintains data regarding reports of trespassing.  *Id.*, Ex. 26 (Slaats Dec. 11, 2007 Dep.) at 111; Ex. 27 (Union Pacific trespasser statistics for 2000 through 2007); Ex. 32 (Federal Railroad Administration trespasser casualty statistics for 2004-2013).  According to Plaintiffs, the statistics attached as Exhibits 27 and 32 to the Fiore Declaration show that there have been over 53 reported incidents of trespassers "in and about the area."  Opposition at 14.  Hughes suggests this number may not accurately reflect the number of trespassers in the area, however because "[i]n reality, which has been shown by the railroad employees in this case, the train crews, local managers, and track inspectors have all failed to comply with the railroad's policy of reporting unauthorized persons on its property; particularly in the area where this incident occurred."  Hughes Decl., ¶ 8.  Hughes cites the testimony of engineer Lobato that he saw trespassers in the area of the incident on numerous occasions but never reported them.  *Id.*  Plaintiffs also cite testimony by Union Pacific's Manager of Operating Practices, David Engman, that he had "coached" Union Pacific employees approximately twice for failure to report trespassers but had never disciplined anyone.  Fiore Decl., Ex. 9 (Engman Dep.) at 41-43.  Engman also testified that he had never had any conversations with Amtrak managers to determine whether its train crews were properly reporting trespassers and he was not aware of any testing to determine whether the policy was being

followed by Amtrak crews.  *Id*. at 63-65.

### 7.  Union Pacific and Amtrak's Alleged Failure to Prevent Pedestrians from Walking Along and Crossing the Railroad Tracks

According to Plaintiffs' expert, Defendants' public safety program should have focused on prevention, using "signs, placement of fencing or other barricades, strict reporting, consistent horn warning, appropriate law enforcement and public education."  Hughes Decl., ¶ 10.  Hughes further opines that "there are clear indications that none of these well-accepted prevention methods were properly utilized" by Defendants.  *Id*.  In particular, Hughes cites the absence of "No Trespassing" signs at the outer limits of the right-of-way and points to Union Pacific's Engineering Track Maintenance Field Manual, Rule 6.5.2, which instructs that "[w]here access to right of way roads is not controlled, post 'No Trespassing' signs . . . ."  *Id*., ¶ 11.  He also opines that Defendants did not make "any effort to work with local law enforcement officers to solicit their cooperation in a concerted effort to stop people from frequenting this location."  *Id*., ¶ 13.  Finally, he opines that in "areas where a trespassing problem has been identified, [Union Pacific] has the ability to erect and maintain fencing and has done so many times."  *Id*., ¶ 13.  According to Hughes, because the area where the incident occurred "has a long history of being treated like a park," Union Pacific could have fenced its right-of-way to prevent access to the tracks or installed a gate or other barrier at the end of the Silliman Sports Complex parking lot.  *Id*., ¶ 14.

Plaintiffs also offer evidence that Union Pacific has used fencing to prevent trespassing in other locations.  In particular, George Slaats testified that Union Pacific has installed fencing at a location in Salinas where trespassers and dumping were reported near the California State San Luis Obispo football stadium.  Fiore Decl., Ex. 26 (Slaats Dep.) at 31, 61.  Slaats further testified that, depending on the location, fencing can be an effective method of reducing trespassing on railroad right-of-ways.  *Id*. at 131-132. Thomas Andrews testified that Amtrak and Union Pacific have jointly installed fencing in areas where people were frequently seen on or near the railroad tracks, including areas in Sacramento, Hayward and Davis, California.  Fiore Decl., Ex. 16 (Andrews Dep.) at 80-83, 86.  Slaats testified that wrought iron fencing that has been used by Union Pacific for this purpose costs between $70.00 and $100.00 per linear square foot.  *Id*. at 56.

1   Plaintiffs' expert opined that in the area where the incident occurred "the railroad could have

2   easily fenced its right-of-way to prevent access to the tracks by people who were using this area"

3   and further, that "access to the area could have been prevented with the installation of a gate or

4   other barrier at the end of the sports and recreation complex parking lot restricting access to the

5   path that leads to the railroad tracks."  Hughes Decl., ¶ 14.

6       **B.    First Amended Complaint**

7          The First Amended Complaint ("FAC") is the operative complaint in this action.  In it,

8   Plaintiffs assert wrongful death and survival claims based on negligence (Claims One and Two)

9   (hereinafter, "Negligence Claims") and premises liability (Claims Three and Four) (hereinafter,

10  "Premises Liability Claims").[9]  Both Amtrak and Union Pacific are named as defendants on the

11  Negligence Claims and the Premises Liability Claims.

12         The negligence claims are based on a variety of theories, including alleged failure to

13  comply with safety requirements, failure to sound the horn properly, failure to operate the train at

14  a safe speed, failure to keep a proper lookout, failure to respond appropriately to a specific,

15  individualized hazard by slowing or stopping the train,  negligent training of the engineer and

16  crew, failure to instruct the engineer and crew on the appropriate circumstances under which they

17  should be prepared to slow or stop a train in response to safety hazards, and failure to recognize

18  local safety hazards or take any reasonable steps to reduce local safety hazards.  *See* FAC ¶¶ 42-77

19  (Claim One) ¶¶ 78-84 (Claim Two).  The Premises Liability Claims are based on allegations that

20  the site where the accident occurred was in an unsafe and defective condition due to Defendants'

21  alleged failure to post proper signs or other warnings and failure to erect a fence or barrier to keep

22  pedestrians from accessing the site even though Defendants allegedly knew that pedestrians

23  frequently crossed and walked along the tracks in this area.  *Id*. ¶¶ 85-97 (Claim Three) ¶¶ 98-104

24  (Claim Four).

25         At oral argument, Plaintiffs stipulated that they are asserting the following claims: 1)

26  premises liability based on failure to warn (Union Pacific); 2) premises liability based on failure to

27

28  [9] An additional claim for dangerous conditions of public property was also asserted against
    various public entities but those claims have been dismissed.

United States District Court
Northern District of California

1    install fencing or gates of some kind (Union Pacific); 3) negligence based on failure to slow in

2    response to a specific hazard (Amtrak); 4) negligence based on failure to sound proper horn

3    sequence (Amtrak); 5) negligence based on failure to monitor, train and supervise as to responding

4    to emergency situations, including when and how to sound the horn and when to slow down when

5    there is a person on the tracks (Amtrak and Union Pacific); [10] and 6) negligence based on failure to

6    post a proper lookout (Amtrak).  Plaintiffs noted that the claim based on failure to post a proper

7    lookout is the "flip side" of the failure to slow claim:  either the crew saw Mr. Carter and did

8    nothing (the negligent failure to slow claim) or they did not see him because they were not posting

9    an adequate lookout (the negligent lookout claim).

10         **C.    The Motion**

11         Defendants contend they are entitled to summary judgment on Plaintiffs' claims against

12   both Union Pacific and Amtrak.  First, they assert that the Negligence and Premises Liability

13   Claims are defective to the extent that Plaintiffs did not differentiate between Amtrak and Union

14   Pacific based on "what the defendants actually controlled and owned."  Motion at 6.  Because

15   Amtrak does not own or control the property where the incident occurred, Defendants assert, it

16   cannot be liable on Plaintiffs' Premises Liability Claims.  *Id.* (citing *Preston v. Goldman*, 42 Cal.

17   3d 108, 114 (1986)).   Conversely, Defendants argue that because Union Pacific does not own,

18   operate or maintain the train involved in the incident, and does not employ the crew responsible

19   for hitting Mr. Carter, it cannot be liable on Plaintiffs' negligent maintenance and operation

20   claims.  *Id.* (*citing Preston*, 42 Cal. 3d at 108, 114; *Mark v. Pac. Gas & Elec. Co.*, 7 Cal. 3d 170,

21   179 (1972)).

22         Second, Defendants argue that Union Pacific cannot be liable on the Premises Liability

23   Claims because it breached no duty owed to Plaintiffs.  *Id.* at 6.   According to Defendants, the

24   existence and scope of a duty is a question of public policy and is typically a question of law to be

25   decided by the court.  *Id.*   Defendants rely on the factors set forth in *Rowland v. Christian*, 69 Cal.

26   2d 108, 113 (1968) ("*Rowland* factors") to support their position that Union Pacific did not owe a

27

28   ───────────────
[10] The Court notes that in the parties' briefs, the negligent training, supervision and retention claim
     was addressed with reference to Amtrak only.

United States District Court
Northern District of California

United States District Court
Northern District of California

1    duty of care to Plaintiffs.  *Id*. at 7 (citing *Parsons v. Crown Disposal Co*. 15 Cal. 4th 456, 465

2    (1997) (reciting *Rowland* factors: 1) foreseeability of harm to plaintiff; 2) degree of certainty that

3    plaintiff suffered injury; 3) closeness of connection between defendant's conduct and injury

4    suffered; 4) moral blame attached to defendant's conduct; 5) policy of preventing future harm; 6)

5    extent of burden on defendant and consequences to community of imposing a duty to exercise

6    care; and 7) the availability, cost and prevalence of insurance for the risks involved)).

7           With respect to foreseeability, Defendants assert that the mere fact that there may have

8    been a "worn path" in the area does not equate with high foreseeability in light of evidence that the

9    site of the accident was an industrial location with almost no residential and limited commercial

10   activity.  *Id*. (citing Bray Decl., ¶ 5; Reddick Decl., ¶¶ 2-3 & Ex. A; Locomotive Video).

11   Defendants also cite the data provided by the Union Pacific Police Department and Response

12   Management Communication Center's reporting in the area.  *Id*. at 8-9 (citing Bray Decl., ¶ 5

13   (stating that there was "minimal reporting of trespasser activity" in the area and "no instances of

14   trespasser vs. train" incidents); Reddick Decl., ¶¶ 2-3).  Even if there were "worn dirt roads and

15   pedestrian paths," Defendants contend, this would not establish foreseeability of harm to "adult

16   members of the public who willfully and knowingly choose to avail themselves of these routes."

17   *Id*. at 9.  This is because courts consider whether injury would be foreseeable "if members of the

18   public exercise a very modest degree of care for their own safety."  *Id*. (citing *Pineda v. Ennabe*,

19   61 Cal. App. 4th, 1403, 1408-1409 (1998)).  Finally, Defendants contend the question of whether

20   there is a duty does not turn entirely on foreseeability but also requires consideration of the other

21   factors listed in *Rowland*.  *Id*. at 9.  In a footnote, Defendants reject Plaintiffs' anticipated reliance

22   on *Silva v. Union Pacific R.R. Co.*, 85 Cal. App. 4th 1024 (2000) for the proposition that railroads

23   have a duty to fence their rights of way if harm to trespassers is foreseeable.  *Id*. at 7 n. 5.  Rather,

24   Defendants assert, that case merely held that where the facts about foreseeability were uncertain,

25   the court could not decide the duty issue as a matter of law.  *Id*.

26          The second factor – the connection between harm and conduct – does not support the

27   existence of a duty, Defendants argue.  *Id*. at 9-10.  This is because Mr. Carter would not have

28   been killed, Defendants assert, if he "exercised the slightest care for his own safety."  *Id*. at 9.  In

particular, Defendants argue that Mr. Carter: 1) "willfully and knowingly chose to trespass on Union Pacific's property for recreational purposes;" 2) "chose to have his dogs off leash in violation of multiple local ordinances despite knowledge that freight and passenger trains frequently used the tracks at issue;" and 3) left a position of safety only seconds before impact in order to retrieve his dog even though the engineer began sounding the train horn about 18 seconds before impact. *Id*. at 9-10.

Defendants further contend that Union Pacific's conduct was not morally blameworthy, the third *Rowland* factor. *Id*. at 10-11. Defendants argue that the level of blameworthiness required to support the imposition of a duty is not the level required to establish ordinary negligence; rather, "a higher degree of moral culpability is required, such as where the defendant intended the harm or acted recklessly or in bad faith." *Id*. at 10 (citing *Adams v. City of Fremont*, 68 Cal. App. 4th 243, 270 (1998); *McCollum v. CBS, Inc*., 202 Cal. App. 3d 989, 1005-006 (1988); *Scott v. Chevron U.S.A.*, 5 Cal. App. 4th 510, 517 (1992); *Dutton v. City of Pacifica*, 35 Cal. App. 4th 1171, 1176 (1995)). Union Pacific's conduct does not meet this standard, Defendants assert, because operating a railroad is a lawful activity and Union Pacific takes an aggressive approach toward trespassing, including the utilization of special agents to remove or cite trespassers found on its property and community outreach efforts to deal with the problem. *Id*. (citing Bray Decl., ¶¶ 3-4).

Defendants argue that the fourth *Rowland* factor also supports their position. *Id*. at 11-12. That factor involves consideration of the burden on Union Pacific and the public if the Court were to impose a duty with respect to Mr. Carter's death. *Id*. Union Pacific asserts that the burden would be significant because it would be difficult to prevent trespassing through the use of officer patrols and extremely expensive to install fences along its thousands of miles of tracks. *Id*. Union Pacific argues that if such a duty were imposed, it would have to pass the additional costs on to its customers, something courts are reluctant to do. *Id*. at 11 (citing *Parsons*, 15 Cal. 4th at 474-475; *Moore v. Regents of the Univ. of California*, 51 Cal. 3d 120, 144-147 (1991); *Brown v. Superior Court*, 44 Cal. 3d 1049, 1063-1065 (1988); *Nola M. v. University of So. Cal.*, 16 Cal. App. 4th 421, 436-437 (1993)). Defendants note that in a case involving similar facts, a court refused to

20

impose on Union Pacific a duty to fence off the right of way because of the burden such a duty would have imposed. *Id*. at 12 (citing *Abboud v. Union Pac. R.R. Co*., No. C-02-4140 VRW, slip. op. 26, ¶. 7-18 (N.D. Cal. June 10, 2004)).

Defendants also contend the *Rowland* factor that focuses on the availability of insurance does not support the imposition of a duty. *Id*.  According to Defendants, "[e]ven if Union Pacific could obtain insurance, plaintiffs can present no proof that the price would be reasonable." *Id*.

Defendants further assert that the case law is "well settled" that Union Pacific "has no duty to post warning signs, as the tracks themselves were a warning of danger." *Id*. at 12.  This is because the danger is obvious, Defendants assert. *Id*. (citing 6 Witkin Summary 10th (2005) Torts § 1126, p. 460) (citing cases)).   Defendants concede that in some situations there may be a duty to warn about or correct even an obvious danger. *Id*. at 13 (citing *Reyes v. Kosha*, 65 Cal. App. 4th 451 (1998); *Krongos v. Pac. Gas & Elec. Co.*, 7 Cal. App. 4th 387, 393-394 (1992)).  Defendants argue that these cases are distinguishable, however, because they involved situations in which the plaintiff had a legitimate reason to be on the property and there was a "practical necessity" for the plaintiff to encounter the danger. *Id*.  That is not the case here, Defendants assert, because Mr. Carter was a trespasser and Union Pacific did not derive any benefit from Mr. Carter being on its property. *Id*.  According to Defendants, similar reasoning has been applied outside of the railroad context, where courts have held that "there is a limit as to how far society should go by way of direct government regulation . . . or indirect regulation thereof through the tort system, in order to protect individuals from their own stupidity, carelessness, daring, or self-destructive impulses." *Id*. (quoting *Edwards v. State of California*, 206 Cal. App. 3d 1284, 1288 (1988)).

Defendants also challenge Plaintiffs' claims against Amtrak, arguing that: 1) the bulk of Plaintiffs' claims are preempted by federal law; and 2) as to the claims that are not preempted, Plaintiffs' evidence is not sufficient to make a prima facie case of negligence. *Id*. at 15-25.  In support of their preemption arguments, Defendants rely on the Federal Rail Safety Act of 1970 ("FRSA") and the regulations promulgated thereunder. *Id*. at 15.

With respect to Plaintiffs' claims based on excessive speed, Defendants contend there are two theories, both of which are preempted. *Id*. at 16-20.  First, according to Defendants,

United States District Court
Northern District of California

Plaintiffs' claim is based on the theory that Union Pacific was aware of trespassers in the area of impact and therefore should have been travelling at a slower speed because the trespassers constituted a local safety hazard. *Id*. at 16. Plaintiffs' second theory, according to Defendants, is that the train should have slowed down in response to a "specific, individual hazard." *Id*.

As to the first theory, Defendants argue that this claim is preempted because the FRA regulations set maximum train speeds for different classes of tracks and those rules establish the duty of care. *Id*. at 17 (citing *CSX Transportation, Inc. v. Easterwood* ("*Easterwood*"), 507 U.S. 658, 664 (1993); 49 C.F.R. § 213.9). Further, Defendants assert, any state law claims, including claims asserted under state tort law, based on a theory of excessive speed are barred if the train was operating within the federal limits established under 49 C.F.R. Part 213. *Id*. (citing *Nippon Yusen Kaisha v. Burlington and N. Santa Fe Ry. Co*., 367 F. Supp. 2d 1292, 1303 (C.D. Cal. 2005)). Here, Defendants argue, it is undisputed that the stretch of track at issue in this case was Class 4 track. *Id*. at 18 (citing JSUMF No. 6). Because 49 C.F.R. § 213.9 sets a maximum speed of 80 mph and it is undisputed the train in this case was travelling at a speed of no more than 63 mph, Defendants contend, Plaintiffs' claim is preempted. *Id*.

With respect to the second unsafe speed theory, Defendants concede that there is a duty to slow down when a "specific, individual hazard" is present and that preemption is no longer applicable under these circumstances. *Id*. at 18 (citing *Easterwood*, 507 U.S. at 664, 676 n. 15; *Federal Ins. Co. v. Burlington Northern and Santa Fe Ry. Co*., 270 F. Supp. 2d 1183, 1187 n. 5 (C.D. Cal. 2003)). Defendants contend the exception does not apply, however, until the collision is *imminent*. *Id*. at 18-19 (citing *Baker v. Canadian Nat'l/Illinois Cent. Ry. Co*., 397 F. Supp. 2d 803, 812-814 (S.D. Miss. 2005); *Liboy v. Rogero*, 363 F. Supp. 2d 1332, 1340 (M.D. Fla. 2005); *Myers v. Missouri Pac. R. Co.*, 52 P.3d 1014, 1028 (Okla. 2002)). Further, Defendants assert, the "specific, individual hazard" must be "seen or otherwise known to the operator of a train to be on the tracks." *Id*. at 19 (citing *Beausoleil v. Nat'l R.R. Passenger Corp*., 145 F. Supp. 2d 119, 121 (D. Mass. 2001)). According to Defendants, an engineer also has a legal right to assume that the person will take reasonable precautions to avoid an approaching train. *Id*. Therefore, Defendants assert, there was no "specific, individual hazard" until Mr. Carter went back to the tracks to rescue

1   his dog, which Defendants contend occurred only three seconds before impact.  *Id*. at 20.  On that

2   basis, Defendants conclude "all claims by plaintiffs that the crew had a duty to Mr. Carter to brake

3   or slow the train beyond the approximate 3 seconds before impact are preempted and must fail."

4   *Id*.

5        Defendants also contend the negligent training and supervision claims are preempted.  *Id*.

6   at 20-21.  According to Defendants, the certifications and qualifications of locomotive engineers

7   are covered by 49 C.F.R. § 20135.  Thus, they assert, under *Easterwood*, state law claims based on

8   the alleged inadequate training of engineers are preempted.  *Id*. (citing *Burlington N. Santa Fe Ry.*

9   *Co. v. Doyle,* 186 F.3d 790 (7th Cir. 1999); *Union P. R.R. Co. v. California Public Utils. Comm'n*,

10  346 F.3d 851, 868-869 (9th Cir. 2003)).  Further, Defendants cite evidence that: 1) at the time of

11  the incident, Amtrak maintained a locomotive engineer training and certification program that

12  fully complied with "all applicable FRA requirements"; and 2) "Michael Lobato, pursuant to that

13  training and certification program, was fully qualified to act as a locomotive engineer on the day

14  of the Incident."  *Id*. (citing Andrews Decl., ¶¶ 5-8).

15       Defendants also challenge Plaintiffs' negligent horn operation claims, both on the grounds

16  of preemption and on the merits.  *Id*. at 21-23.  First, Defendants reject Plaintiffs' reliance on 49

17  C.F.R. § 229.129, which sets a minimal decibel level for locomotive horns at 96dB(A) at 100 feet

18  forward of the locomotive in the direction of travel.  *Id*. at 22 (citing FAC at 10-11).  According to

19  Defendants, "Amtrak performed an inspection on the subject locomotive on the day of the

20  Incident, at which time horn audibility was documented at 115dB(A) 100 feet forward of the

21  locomotive."  *Id*. (citing Caniezo Decl., ¶ 4 & Ex. B).  Thus, Defendants assert, Plaintiffs' claim

22  lacks merit (to the extent it is based on the standard set forth in the regulation) and is preempted

23  (to the extent Plaintiffs assert that the audibility of the horn was insufficient even though it

24  exceeded the level required under the federal regulation).  *Id*. at 22.

25       Second, Defendants assert that Plaintiffs' claim fails to the extent it is based on the train

26  crew's alleged failure to comply with the requirements of 49 C.F.R. § 221.21)(a)-(b)(2) for

27  sounding the horn when approaching a public crossing.  *Id*.  According to Defendants, the

28  evidence shows that the requirements of 49 C.F.R. § 221.21(a) (requiring that the horn sequence

23

must be initiated between 15 and 20 seconds before entering the crossing) were met because the video shows that the crew did initiate a horn sequence "on its approach to the Stevenson Boulevard crossing." *Id*. (citing Locomotive Video and Event Recorder (starting at 10:18:58)). Further, as to the long, long, short, long pattern, Defendants contend there is no Federal requirement regarding the precise duration of each phase of that horn sequence. *Id*. In addition, Defendants cite the testimony of engineer Lobato that the sequence for entering the crossing was "cut short and turned into an emergency horn pattern due to Mr. Carter's presence near the tracks." *Id*.

Third, Defendants argue that the horn sequence required for public crossings is not relevant in any event because the impact occurred 508 feet south of the Stevenson crossing. *Id*. at 22-23. The requirements for sounding the horn when a train is not at a public crossing, Defendants assert, are set forth in 49 C.F.R. § 222.23(a), which provides that engineers may, but are not required, to sound a locomotive horn for the purposes of warning trespassers. *Id*. at 23. Because the regulation is "unequivocal" on this point, Defendants contend, all of Plaintiffs' claims regarding horn audibility, sequencing and duration are preempted under 49 C.F.R. § 222.23. *Id*. Defendants also argue that the savings clause contained in 49 C.F.R. § 20106 (providing that state laws aimed at "an essentially local safety or security hazard" are not preempted and that state law claims may be asserted based on a party's failure to comply with its own plan, rule, or standard that it created pursuant to a regulation or order issued by the Secretary of Transportation or the Secretary of Homeland Security) does not apply here because "there is no essentially local safety hazard in the area that would necessitate a more stringent state law requirement for horn application, and Amtrak did not fail to comply with its own plan, rule or standard created pursuant to a regulation or order issued by the federal government." *Id*. Defendants also assert that "the only conclusions a reasonable trier of fact can draw is that the train crew's horn application was neither negligent nor a substantial factor in causing the impact." *Id*. (citing *Gray v. Brinkerhoff*, 41 Cal. 2d 180, 183 (1953)).

Finally, Defendants contend Plaintiffs' evidence is not sufficient to make a prima facie case of negligence based on alleged failure to maintain a proper lookout and failure to respond

24

appropriately to a specific, individual hazard. *Id*. at 24. With respect to the lookout claim,

Defendants cite evidence that the crew saw Mr. Carter before they reached the Stevenson crossing

and that Lobato "transitioned from a crossing horn pattern to an emergency horn pattern at least 6

seconds before impact." *Id*. (citing LaFranchi Decl., Ex. B (Lobato Dep.) at 34; Ex. D (Battles

Dep.) at 32-33, 55-56; Locomotive Video, Event Recorder & Heikkila Decl., ¶ 2 & Ex. A

(Heikkila Report), §§ 3.5, 3.9). As to the alleged failure to respond appropriately to the specific,

individual hazard, Defendants assert this claim did not arise until 3 seconds before impact (for the

reasons discussed above) and that the evidence shows that by that time, Lobato was unable to

avoid hitting Mr. Carter even though he reasonably and appropriately responded to the situation.

*Id*. (citing Heikkila Decl., Ex. A (Heikkila Report), §§ 3.2, 3.7; Event Recorder; Locomotive

Video).

### D.    Opposition

In their Opposition brief, Plaintiffs argue that their Negligence Claims against Amtrak are

not preempted and that there are material issues of fact that preclude summary judgment on these

claims. Opposition at 16-27. With respect to Union Pacific, Plaintiffs reject Defendants'

argument that Union Pacific owed no duty of care, arguing that it had a general duty as a

landowner to protect against foreseeable harms and that railroads are not exempt from this duty.

*Id*. at 28. Plaintiffs further contend there are material disputes of fact regarding whether Union

Pacific breached this duty. *Id*. at 29.

On the question of preemption, Plaintiffs argue that there is a strong presumption against

federal preemption, especially where preemption would displace the historic power of the states to

protect the health and safety of their citizens. *Id*. at 16-17 (*citing Cipollone v.Ligget Groups, Inc.*,

505 U.S. 504 (1992); *California v. ARC America Corp*., 490 U.S. 93 (1989); *Rogers v. Consol.

Rail Corp*., 948 F.2d 858 (2d Cir. 1991); *Florida Lime & Avacado Growers Inc. v. Paul*, 373 U.S.

132, 144 (1963); *Rice v. Santa Fe Elevator Corp*., 337 U.S. 218, 230 (1947)). According to

Plaintiffs, it is well-settled that preemption under the FRSA, the scope of which is set forth in 49

U.S.C. § 20106(a)(1), is not complete. *Id*. at 17. In particular, Plaintiffs assert states can, and

always could: 1) "adopt or continue in force a law, regulation, or order related to railroad safety or

United States District Court
Northern District of California

United States District Court
Northern District of California

1   security until the Secretary of Transportation . . . prescribes a regulation or issues an order

2   covering the subject matter of the State requirement," *id*. at 17-18 (quoting *Zimmerman v. Norfolk*

3   *S. Corp*., 706 F.3d 170,177 (3d Cir. 2013) (quoting 49 U.S.C. § 20106(a)(2)); and 2) "adopt or

4   continue in force a 'more stringent law' if it is necessary to eliminate a 'local safety or security

5   hazard.'" *Id*. at 18 (citing *Zimmerman*, 706 F.3d at 177 (quoting 49 U.S.C. § 20106(a)(2)(A)).

6          Plaintiffs further contend Defendants' reliance on *Easterwood* in support of their

7   preemption arguments is misplaced.  *Id*.  First, Plaintiffs argue Defendants misstate the holding of

8   *Easterwood*.  *Id*.  According to Plaintiffs, *Easterwood* "makes clear the Supreme Court will be

9   very cautious and slow to find federal preemption" and held in the area of railroad crossing safety,

10  that "preemption will be limited to those laws that run contrary to the federal scheme." *Id*.

11  Plaintiffs then address the Supreme Court's subsequent decision in *Norfolk Southern Railway Co*.

12  *v. Shanklin,* 529 U.S. 344 (2000).  *Id*.  Plaintiffs  assert that the expansive  view of preemption

13  taken in *Shanklin* all but displaced state negligence law, ultimately causing Congress to revise the

14  FRSA preemption clause (49 U.S.C. § 20106) in 2007 "to clarify that this section could no longer

15  be used to shield railroads from liability where the railroad violated FRSA standards, applicable

16  state law, or internal railroad operating rules." *Id*. at 19.  Plaintiffs note that during the

17  amendment process, Congress expressly rejected language proposed by the Association of

18  American Railroads stating as follows:  "Nothing in this provision shall otherwise affect the scope

19  or application of this section as interpreted by the U.S. Supreme Court in *Easterwood* and

20  *Shanklin*."  *Id.* at 20.  The 2007 amendment and associated legislative history, Plaintiffs contend,

21  make clear that "railroad accident victims [have] the right to seek recovery in state courts when

22  they allege railroads violate safety standards imposed by a railroad's own rules, certain state laws,

23  or federal regulations." *Id*. (quoting *Lundeen v. Canadian Pac. Ry. Co*., 532 F.3d 682, 690 (8th

24  Cir. 2008)).

25         Next, Plaintiffs reject  Defendants' specific preemption arguments aimed at Plaintiffs'

26  claims for negligent failure to slow or stop the train, failure to keep a proper lookout, failure to

27  sound the horn properly, and negligent operation of the train and training, supervision and

28  retention.  *Id*. at 21-28.   As to the claim that Amtrak was negligent in failing to slow or stop the

United States District Court
Northern District of California

train, Plaintiffs assert Defendants have misunderstood the claim to the extent they suggest it is based on alleged violation of the federal speed limit. *Id.* at 21. Rather, Plaintiffs assert, the claim is based on the theories that: 1) Amtrak was negligent for not slowing to avoid Mr. Carter and his dogs, which "*could* and did cause a collision"; and 2) "the train crew violated Amtrak's own safety rules by not slowing the train once the crew saw Mr. Carter and his dogs on or near the tracks." *Id.* (emphasis in original). According to Plaintiffs, Defendants failed to address the second theory altogether, and in any event, neither theory is preempted because an exception to preemption has been recognized for the "breach of 'related tort duties, such as the duty to slow or stop a train to avoid a specific, individual hazard.'" *Id.* (quoting *Easterwood*, 507 U.S. at 675 n. 15). A "specific, individual hazard," Plaintiffs assert, is a "unique occurrence which *could cause* an accident to be imminent rather than a generally dangerous condition." *Id.* (citing *Anderson v. Wisconsin Cent. Transp. Co.*, 327 F. Supp. 2d 969, 978 (E.D. Wis. 2004) (emphasis in original). This includes a person on or near the tracks, Plaintiffs assert. *Id.* (citing *Florida East Coast Ry. Co. v. Griffin*, 566 So. 2d 1321, 1324 (Fla. Dist. Ct. App. 1990)). Here, Plaintiffs assert, the evidence shows that Lobato and Battles were aware Mr. Carter and his dogs were on or near the track at least a quarter of a mile away and 19 or 20 seconds before impact and yet neither considered slowing the train even though they admitted they were not surprised Mr. Carter tried to save his dog. *Id.* According to Plaintiffs, the moment Lobato and Battles saw Mr. Carter and his dogs a quarter of a mile ahead, there was an imminent "specific individual hazard" and the crew had a duty to apply the emergency brake and properly sound the horn. *Id.* at 23.

Plaintiffs also reject Defendants' argument that Lobato and Battles had a right to assume Mr. Carter would be clear of the tracks and therefore were not required to slow the train. *Id.* According to Plaintiffs, the cases cited by Defendants in support of this argument pre-date the enactment of federal regulations to protect railroad workers working on the tracks. *Id.* (citing 49 C.F.R. §§ 214.337, 214.347, 214.339). Plaintiffs contend these regulations were enacted because Congress was "tired of trains killing workers and then arguing it was the workers' own fault for not getting out of the way." *Id.* In light of these new regulations, Plaintiffs assert, the holdings of the cases cited by Defendants are no longer sound. *Id.* Further, these regulations, along with

1    other internal safety rules and industry standards establish there was an "imminent" situation once

2    Lobato and Battles saw Mr. Carter and his dogs within 25 feet of the tracks, Plaintiffs assert. *Id.*

3    (citing 49 C.F.R. § 213.1; Rule 33.8.1 of the Union Pacific Air Brake and Train Handling Rules;

4    Hughes Decl.,  ¶ 23 & Ex. 3 (Operation Lifesaver Brochure)).  Moreover, Plaintiffs contend, both

5    Battles and Lobato testified that they knew that they were required by mandatory, internal safety

6    rules to initiate an emergency brake application, without hesitation, when life is in danger. *Id.*

7        Plaintiffs also assert Defendants' position fails because they have cited no California cases

8    in support of the assertion that train operators have the right to assume persons and property will

9    get clear of the track in time to avoid a collision. *Id.* at 24.  In fact, Plaintiffs assert, "[u]nder

10   California law, a train crew member must use reasonable case to guard against both dangerous

11   situations that are actually imminent and dangerous situations that are reasonably likely to occur."

12   *Id.* (citing CACI 803; *Huggans v. Southern Pac. Co.*, 92 Cal. App. 2d 599, 602-608 (1949)).

13   Further, Plaintiffs assert, "[i]t is presumed an engineer of a moving train sees what is in range of

14   his vision ahead of him and must react to a 'specific individual hazard' *that could cause a*

15   *collision*." *Id.* (citing *Myers v. Missouri Pacific Railroad Co.*, 52 P.3d 1014, 1027 (Okla. 2002);

16   *Greene v. Atchison, T. & S.F. Ry. Co.*, 120 Cal. App. 2d 135, 139 (1953)).  Therefore, Plaintiffs

17   argue, under California law, "a train operator has a duty to attempt to avoid hitting a pedestrian

18   once the pedestrian reaches a position on or near the track within the area in which the train will

19   strike him if it proceeds." *Id.* (citing *Huggans*, 92 Cal. App. 2d at 603-604).  Plaintiffs further

20   contend that under California law, "it is for the jury to say whether the speed of [a] train was too

21   high for a specific, individual hazard." *Id.* (citing *Romo v. Southern Pacific Transportation*, 71

22   Cal. App. 3d 909, 916 (1977)).  Plaintiffs assert that drawing all inferences in their favor, a jury

23   could reasonably conclude that the outcome would have been different if Lobato and Battles had

24   used reasonable case when they saw Mr. Carter and his dogs on or near the tracks. *Id.*

25       Plaintiffs next contend that under California law, Amtrak "has a duty to keep a reasonable

26   lookout and if the engineer discovers a person on or near the track, he/she must use reasonable

27   care to avoid causing harm." *Id.* at 24-25 (citing CACI 804; *Essick v. Union Pacific R.R. Co.*, 182

28   Cal. App. 2d 456, 463 (1960); *Herrera v. Southern Pacific Co.*, 155 Cal. App. 2d 781, 785

United States District Court
Northern District of California

28

(1957)).

Next, Plaintiffs address Amtrak's alleged negligence as to the sounding of the horn.  *Id*. at 25-26.  Plaintiffs contend the train violated 49 C.F.R. § 221.21(b)(2), which requires that the horn begin to be sound between 15 and 20 seconds before a crossing and that this constitutes negligence per se.  *Id*. at 25.  Plaintiffs further contend Amtrak violated several provisions of GCOR, including Section 5.8.2 ("Sounding Whistle"), which also establishes that Amtrak was negligent.

Plaintiffs also argue that Defendants are incorrect in their assertion that Plaintiffs' negligent training and supervision claims are preempted by federal regulations governing the training of engineers.  *Id*. at 26.  In light of the 2007 amendment to the FRSA preemption clause, Plaintiffs argue, Plaintiffs may assert negligence claims based on failure to abide by these regulations, which themselves constitute the federal standard of care.  *Id*. (citing *Zimmerman*, 706 F.3d at 177-178; 49 C.F.R. §§ 240.127(b), 240.129(b), 217.9(a), 217.11(a) and 218.11).  Plaintiffs argue that because Amtrak and Union Pacific violated these federal standards of care for training and supervision, their claims are not preempted.  *Id*. at 27 (citing *Henning v. Union Pac. R.R. Co*., 530 F.3d 1206, 1215 (10th Cir. 2008)).

Plaintiffs further contend there are triable issues of material fact as to whether these standards were violated in connection with both Lobato and Battles.  *Id*.  As to Lobato, Plaintiffs cite evidence  that: 1) Lobato was hired by Amtrak and worked as a trainer for several years even though in the seven years before he was hired he had hit at least 10-15 pedestrians; 2) Lobato was not trained by Amtrak on how to handle situations involving pedestrians and animals on the tracks; 3) Lobato was not tested for drugs or alcohol after striking Mr. Carter; 4) Lobato did not recall a rule that required him to apply the emergency brake without hesitation if he believed life or property were in danger; 5) Amtrak did not train him that the long blasts should be 4-5 seconds and the short blasts should be 1-2 seconds and that the total sequence should last 15-20 seconds; and 6) Lobato was never taught how to execute the short blasts pursuant to GCOR Section 5.8.2(1) for warning pedestrians and animals of an oncoming train.  *Id*.  As to Battles, Plaintiffs cite evidence that: 1) he only received in-field training from Lobato; 2) Amtrak did not train him

29

1   on how to handle situations involving people and animals on the tracks; 3) Amtrak did not train

2   him as to how long the long and short blasts should be when sounding the long, long, short, long

3   sequence but instead, simply gave him the GCOR and told him to follow them; and 4) Battles

4   struck a pedestrian and was not disciplined and had never heard of any engineer being disciplined

5   for hitting a pedestrian.  *Id.*

6        Plaintiffs also cite the testimony of Amtrak's Assistant Superintendent of Road Operations,

7   Tommy Andrews, asserting that Andrews' testimony shows that: "1) Amtrak's training of its

8   engineers does not include teaching them to report unsafe conditions, such as reporting trespassers

9   near tracks . . . [;] 2) reporting trespassers was not something that was taught during periodic

10   training of their engineers [;] and 3) Amtrak does not know if Lobato was trained to report

11   trespassers, or if Lobato and Battles were re-trained after this incident."  *Id.* at 27-28.

12        With respect to their claims against Union Pacific, Plaintiffs argue that Defendants' request

13   for summary judgment should be denied because Union Pacific owed a general duty of care as a

14   landowner to discover unsafe conditions and give warning of anything that could reasonably be

15   expected to harm, regardless of whether the individual who was harmed was trespassing.  *Id.* at 28

16   (citing Cal. Civ. Code § 1714(a); CACI 1001 and 3713; *Rowland v. Christian*, 69 Cal. 2d 108, 119

17   (1968); *Ann M. v. Pacific Plaza Shopping Center*, 6 Cal. 4th 666, 674-675 (1993)).  According to

18   Plaintiffs, "these general duties apply to railroad track owners, who must use reasonable care to

19   avoid causing injury to anyone crossing [their] tracks and use reasonable care in the design and

20   maintenance of warning signals and protective devices."  *Id.* (citing CACI 800, 801).  Plaintiffs

21   concede that Union Pacific does not have an "absolute duty . . . to fence off every inch of [its]

22   tracks" but contend that there is, nonetheless, a duty on the part of railroads to protect against

23   foreseeable harms.  *Id.* at 29 (citing *Essick v. Union Pacific R.R. Co.*, 182 Cal. App. 2d456, 463

24   (1960); *Staggs v. Atchison, Topeka & Santa Fe Ry. Co.*, 135 Cal. App. 2d 492, 500 (1955);

25   *Smithwick v. Pacific Electric Ry. Co.*, 206 Cal. 291, 300 (1929)).

26        Here, Plaintiffs contend, there is evidence that this area of tracks was heavily used by

27   people and animals and therefore the likelihood of injury was foreseeable.  *Id.*  Under these

28   circumstances, Plaintiffs assert, Union Pacific had a duty to take reasonable steps to prevent harm

United States District Court
Northern District of California

such as installing some warning signs and/or fencing in the area.  *Id.* at 29-30 (citing *Silva v.*

*Union Pacific R.R. Co.*, 85 Cal. App. 4th 1024, 1029 (2000)).  Plaintiffs also point to evidence

they contend shows that Union Pacific failed to take reasonable steps to prevent foreseeable harm

by failing to enforce its zero tolerance policy as to trespassing and/or work with Amtrak to ensure

their engineers were reporting trespassers.  *Id.* at 30. Plaintiffs also assert that another individual

had been hit at the nearby Mowry crossing.  *Id.*[11]

Plaintiffs further assert that Union Pacific's own operating rules required it to take

measures to protect individuals who were on or near the tracks in the area where the incident

occurred.  *Id.* at 31 (citing Fiore Decl., Ex. 34 (Union Pacific Claims Operation Manual)).  In

particular, the Operation Manual states that although the railroad owes no duty to a trespasser

whose presence is unknown, once the "railroad knows or should realize that a trespasser is present,

it then has a duty to exercise due care to warn him or her of conditions or activities which may

involve risk or harm." Fiore Decl., Ex. 34.  The manual continues:

> When persons habitually use a railroad property, such as those who
> cross yards as a shortcut, the railroad owes no duty unless it knows
> or should realize that this is taking place.  Physical evidence such as
> a "beaten path" is usually sufficient to charge the railroad with such
> knowledge.  Once the railroad has this knowledge, all trespassers are
> considered Constant Trespassers Upon a Limited Area (CTULA),
> whether or not they have ever trespassed before and whether or not
> their individual presence is known.  The railroad has a duty to
> discover whether or not CTULA's as a class are trespassing and,
> once it has such knowledge, it owes a duty to exercise due care to
> warn them of or make safe conditions or activities which may
> involve risk of harm.

*Id.*

Plaintiffs assert Union Pacific also violated 49 C.F.R. § 213.1, which "requires railroads to

take remedial actions when it knows that a combination of conditions may affect safety."

Opposition at 31.  According to Plaintiffs, "[i]t is mandatory to railroad employees to report

locations like this where pedestrians are frequently accessing the tracks" yet "Lobato never

reported the pedestrians he had seen in the area in the past, and did not even know where the right

---

[11] Plaintiffs do not cite any specific evidence in support of this assertion and the Court has found none.

United States District Court
Northern District of California

1    of way was located at the incident site to understand how close one has to be to the tracks to be a

2    'trespasser.'" *Id*. at 31-32.

3          Plaintiffs reject Defendants' reliance on *Parsons v. Crown Disposal Co*., 15 Cal. 4th 456

4    (1997), where the court found that the defendant did not owe a duty of care. *Id*. at 32. Plaintiffs

5    contend that case is not on point because the defendant was not a landowner and therefore, the

6    general duties owed by landowners did not apply. *Id*. Plaintiffs further contend that "[t]here

7    simply can be no argument that Union Pacific owed general duties to protect against foreseeable

8    harms" and therefore, the Court need not engage in a consideration of the *Rowland* factors to

9    determine whether there was a duty. *Id*.

10         Even if the Court were to engage in a consideration of the *Rowland* factors, Plaintiffs

11   assert, it would find that Union Pacific owed a duty to Plaintiffs. *Id*. at 32-33. First, Plaintiffs

12   contends there is evidence Union Pacific knew pedestrians frequently hiked and walked in the

13   area. *Id*. at 33. In particular, Plaintiffs contend a pedestrian had been struck at the Mowry crossing

14   and there were 50 confirmed incidents of trespassing. *Id*. Second, Plaintiffs assert, "[t]he degree

15   of certainty that the plaintiff suffered injury is . . . undeniable." *Id*. To the extent Defendants seek

16   to place the blame on Mr. Carter instead, Plaintiffs point out that California is not a contributory

17   negligence state but rather, is a comparative negligence state. *Id*. (citing *Li v. Yellow*, 13 Cal. 3d

18   804 (1975)). Consequently, Plaintiffs assert, it must only be shown that Defendants' conduct was

19   a "substantial factor" in causing the harm – a question that is ordinarily decided by the jury. *Id*.

20   (citing *Bockrath v. Aldrich Chemical Co*., 21 Cal. 4th 71, 79 (1999); *Raven H. v. Garnette*, 157

21   Cal. App. 4th 1017, 1029-1030 (2007)). Third, the moral blameworthiness factor points toward

22   the existence of a duty, Plaintiffs assert, because Union Pacific had actual or constructive

23   knowledge that pedestrians were frequently using the area to hike and walk with their dogs. *Id*. at

24   33-34 (citing *Adams v. City of Fremont*, 68 Cal. App. 4th 243, 270 (1998) (citing *Rosenbaum v.*

25   *Security Pacific Corp*., 43 Cal. App. 4th 1084, 1098 (1996)). Fourth, consideration of the policy

26   of preventing future harm and the burden of imposing a duty on Defendants also supports

27   imposition of a duty, Plaintiffs argue, because "safeguarding human life from injury is the

28   'greatest responsibility as members of a civilized society.'" *Id*. at 34 (citing *Juarez v. Boy Scouts*

United States District Court
Northern District of California

*of America*, 81 Cal. App. 4th 377, 407 (2000)).  Further, Plaintiffs assert, the burden to Union Pacific of imposing such a duty is not heavy because the Court would merely be requiring that Union Pacific enforce its own rules.  *Id.*  In addition, Plaintiffs argue, the cost of fencing off the Silliman Sports Center trailhead would be negligible.  *Id.*[12]  The *Rowland* factor instructing courts to consider the issue of insurance also supports the existence of a duty, Plaintiffs argue, because Union Pacific "is self-insured for the amount of Plaintiffs' claim."  *Id.* (citing Fiore Decl., ¶ 39).

Finally, Plaintiffs reject Defendants' assertion that Union Pacific had no duty to warn because a railroad is a visible and obvious danger.  *Id.* at 34.  This position, Plaintiffs assert, may accurately characterize the law before California abandoned the contributory negligence doctrine, in *Li v. Yellow Cab Co. of California*, 13 Cal. 3d 804 (1975).  Now that California has adopted the comparative negligence doctrine, however, summary judgment based on the plaintiff's own negligence is rarely appropriate, Plaintiffs contend.  *Id.* at 35.   Plaintiffs reject Defendants' reliance on *Christoff v. Union Pacific R.R. Co.*, 134 Cal. App. 4th 118 (2005), arguing that the case was factually distinguishable because the pedestrian was walking on a train bridge and knew there was "a train crossing on the bridge at that time."  *Id.*  In addition, Plaintiffs assert, that case did not involve a "well-worn trail that was seen by the train crew."  *Id.*   Plaintiffs also argue Defendants have ignored "black letter California law specifically addressing warnings for railway systems."  *Id.* (citing CACI 805).  According to Plaintiffs, Defendants' reliance on CACI 806 is misplaced because it addresses the engineer's duty to approach a crossing with care, not the duty to warn, which is, in any event, a question of fact.  *Id.* (citing *Wilkinson v. Southern Pacific Co.*, 224 Cal. App. 2d 478, 487-488 (1964)).

### E.   Reply

In their Reply brief, Defendants note that Plaintiffs did not address – and thus implicitly conceded – their arguments that Amtrak cannot be liable on the Premises Liability Claims and Union Pacific cannot be liable for the alleged negligence regarding the train operation and training of the crew. Reply at 2.  With respect to the duty Plaintiffs contend is owed by Union Pacific,

---

[12] Plaintiffs contend "Union Pacific knows this" but cite no evidence in support of this assertion. *Id.*

United States District Court
Northern District of California

Defendants reject Plaintiffs' assertion that the *Rowland* factors need not be considered and reiterate their argument that those factors establish that Defendants owe no duty to Plaintiffs. *Id*. at 3-11.   As to the claims against Amtrak, Defendants argue that Plaintiffs have mischaracterized the law as to the applicability of the exception to preemption where there is a "specific, individual hazard." *Id*. at 12-14.   With respect to Plaintiffs' assertion that Amtrak failed to comply with federal regulations as to training, supervision and retention of crew members,  Defendants contend that in the face of the declaration of Tommy Andrews (submitted by Amtrak) describing Amtrak's certified training program, Plaintiffs were required to offer evidence specifically identifying federal training requirements with which Amtrak did not comply. *Id*. at 14-16.  According to Defendants, for this reason they are entitled to summary judgment on Plaintiffs' negligent training claim. *Id*.  As to the alleged negligent horn claims, Defendants argue that the claim is preempted and that Plaintiffs have offered no evidence showing that the duration of the horn blasts as the train approached the crossing were covered by a rule or regulation applicable to Amtrak. *Id*. at 16. Further, Defendants assert, the sequence that is required as a train approaches a crossing is not relevant because Mr. Carter was struck beyond the crossing. *Id*.  In addition, Defendants argue that engineers have no legal obligation to sound an emergency horn under 49 C.F.R. § 222.23(a)(2). *Id*.  Finally, Defendants argue that Plaintiffs have failed to submit sufficient evidence to survive summary judgment on their improper lookout and negligent slowing/braking claims. *Id*. at 17-20.

## III.    ANALYSIS

### A.    Legal Standard under Rule 56 of the Federal Rules of Civil Procedure

Summary judgment on a claim or defense is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  In order to prevail, a party moving for summary judgment must show the absence of a genuine issue of material fact with respect to an essential element of the non-moving party's claim, or to a defense on which the non-moving party will bear the burden of persuasion at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  Once the movant has made this showing, the burden then shifts to the party opposing summary judgment to designate

United States District Court
Northern District of California

1   "specific facts showing there is a genuine issue for trial." *Id*.  "[T]he inquiry involved in a ruling

2   on a motion for summary judgment . . . implicates the substantive evidentiary standard of proof

3   that would apply at the trial on the merits."  *Anderson v. Liberty Lobby Inc*., 477 U.S. 242, 252

4   (1986).  On summary judgment, the court draws all reasonable factual inferences in favor of the

5   non-movant.  *Id*. at 255.

6   **B.   Claims Against Union Pacific[13]**

7   **1.   Legal Standards Governing Premises Liability under California Law**

8   Under California law, premises liability is a form of negligence.  *Brooks v. Eugene Burger*

9   *Management Corp*., 215 Cal.App.3d 1611, 1619 (1989).  To prevail on a claim for negligence, a

10  plaintiff must establish that "defendant had a duty to plaintiff, that the duty was breached by

11  negligent conduct, and that the breach was the cause of damages to the plaintiff." *Id*.  Premises

12  liability is based on the general duty of the owner of property "to exercise ordinary care in the

13  management of such premises in order to avoid exposing persons to an unreasonable risk of

14  harm." *Id*. (citation omitted).  This general duty is codified in California Civil Code § 1714,

15  which provides that "[e]veryone is responsible, not only for the result of his or her willful acts, but

16  also for an injury occasioned to another by his or her want of ordinary care or skill in the

17  management of his or her property . . . ."  To prevail on a premises liability claim, a plaintiff must

18  establish that the defendant owned or controlled the property, that the defendant was negligent in

19  the use or maintenance of the property, that the plaintiff was harmed, and that the defendant's

20  negligence was a substantial factor in causing the harm.  Judicial Council of California Civil Jury

21  Instructions ("CACI"), No. 1000.  A person who owns or controls property is negligent if he or

22  she fails to use reasonable care to discover any unsafe conditions and to repair, replace, or give

23

24  [13] Union Pacific seeks summary judgment as to Plaintiffs' claims based on negligent maintenance
     and operation of the train on the basis that it did not own or operate the Amtrak train that struck

25  Mr. Carter.  At oral argument, Plaintiffs stipulated that their claims for negligent failure to slow
     the train in response to a specific hazard, failure to maintain a proper lookout and negligent

26  operation of the horn are asserted against Amtrak only.  Therefore, to the extent those claims were
     asserted against Union Pacific, the Motion is GRANTED. As to the remaining negligence claim,

27  for negligent training and supervision, which Plaintiffs assert against both Defendants, summary
     judgment is GRANTED in favor of Union Pacific for the same reason the Court grants summary

28  judgment in favor of Amtrak, namely, that the claim is preempted by federal law, as discussed
     below.

United States District Court
Northern District of California

1    adequate warning of anything that could be reasonably expected to harm others.  CACI No. 1001.

2    However, under some circumstances, a property owner may owe no duty or only a limited duty to

3    individuals who come onto their land.

4         Prior to the California Supreme Court's seminal decision of *Rowland v. Christian*, 69 Cal.

5    2d 108 (1968), California courts followed the common law, which provided that landowners owed

6    only limited duties to trespassers.  *See* 6 Witkin, Summary of California Law (10th ed. 2005), §

7    1095 at p. 426 (citations omitted).   In particular, landowners owed unknown trespassers no duty

8    to keep the premises in a safe condition or carry on activities carefully; rather, they were only

9    required to refrain from intentional harms.  However, where a landowner knew or should have

10   known that a trespasser had come on the land, the landowner had a duty to warn of artificial

11   conditions that constituted a concealed danger and to exercise reasonable care in carrying on

12   activities.  *Id*.  Further, in cases involving trespassers on railroad tracks, California courts held that

13   where trespassers "habitually and notoriously crossed the tracks, for a long period of time, with

14   the acquiescence of the company" the company owed a duty of care to both discover and avoid

15   injury to them.  *Id*. at p. 427 (citing *Smithwick v. Pacific Elec. Ry. Co*., 206 Cal. 291, 303 (1929);

16   *Staggs v. Atchison, Topeka & Santa Fe Ry. Co*., 135 Cal.App.2d 492, 500 (1955)).

17        In *Rowland v. Christian,* the court rejected the common law's heavy emphasis on the status

18   of the plaintiff to determine the scope of the landowner's duty.  69 Cal. 2d at 118-119.  The court

19   explained this shift in approach as follows:

20             A man's life or limb does not become less worthy of protection by
             the law nor a loss less worthy of compensation under the law
21             because he has come upon the land of another without permission or
             with permission but without a business purpose. Reasonable people
22             do not ordinarily vary their conduct depending upon such matters,
             and to focus upon the status of the injured party as a trespasser,
23             licensee, or invitee in order to determine the question whether the
             landowner has a duty of care, is contrary to our modern social mores
24             and humanitarian values. The common law rules obscure rather than
             illuminate the proper considerations which should govern
25             determination of the question of duty.

26   *Id*. at 118.  The court made clear that the policy articulated in California Civil Code § 1714,

27   providing that "[e]veryone is responsible . . . for an injury occasioned to another by his or her want

28   of ordinary care or skill in the management of his or her property or person," is not subject to

1    "wholesale immunities resulting from the common law classifications." *Id.* at 119. Rather, "[t]he

2    proper test to be applied to the liability of the possessor of land in accordance with section 1714 of

3    the Civil Code is whether in the management of his property he has acted as a reasonable man in

4    view of the probability of injury to others . . . ." *Id.*

5         The *Rowland* court held that departures from the "fundamental principal" "that a person is

6    liable for injuries caused by his failure to exercise reasonable care in the circumstances" "involves

7    the balancing of a number of considerations":

8              the major ones are the foreseeability of harm to the plaintiff, the
               degree of certainty that the plaintiff suffered injury, the closeness of
9              the connection between the defendant's conduct and the injury
               suffered, the moral blame attached to the defendant's conduct, the
10             policy of preventing future harm, the extent of the burden to the
               defendant and consequences to the community of imposing a duty to
11             exercise care with resulting liability for breach, and the availability,
               cost, and prevalence of insurance for the risk involved.
12

13   *Id.* at 112-113.

14        The existence of duty is a question of law for the court. *Ballard v. Uribe,* 41 Cal.3d 564,

15   572, fn. 6 (1986). In *Ballard v. Uribe*, the California Supreme Court acknowledged that "[s]ome

16   confusion has arisen over the respective roles played by the court and the jury" in the context of

17   negligence claims asserted against property owners. *Id.* The court offered the following

18   clarification:

19             The confusion may stem, at least in part, from the fact that the
               "foreseeability" concept plays a variety of roles in tort doctrine
20             generally; in some contexts it is a question of fact for the jury,
               whereas in other contexts it is part of the calculus to which a court
21             looks in defining the boundaries of "duty." The question of "duty" is
               decided by the court, not the jury. (See 4 Witkin, Summary of Cal.
22             Law (8th ed. 1974) Torts, § 493, p. 2756 and cases cited; Prosser &
               Keeton on Torts (5th ed. 1984) p. 236.) As this court has explained,
23             "duty" is not an immutable fact of nature "'but only an expression of
               the sum total of those considerations of policy which lead the law to
24             say that the particular plaintiff is entitled to protection.'" ( *Dillon v.
               Legg* (1968) 68 Cal.2d 728, 734 [69 Cal.Rptr. 72, 441 P.2d 912, 29
25             A.L.R.3d 1316] [quoting Prosser, Law of Torts, (3d ed. 1964) pp.
               332-333].) In California, the general rule is that all persons have a
26             duty "'to use ordinary care to prevent others being injured as the
               result of their conduct. . . .'" (*Rowland v. Christian* (1968) 69 Cal.2d
27             108, 112 [70 Cal.Rptr. 97, 443 P.2d 561] (citations omitted); Civ.
               Code, § 1714.) *Rowland* enumerates a number of considerations,
28             however, that have been taken into account by courts in various

United States District Court
Northern District of California

37

contexts to determine whether a departure from the general rule is appropriate . . . . The foreseeability of a particular kind of harm plays a very significant role in this calculus (*see Dillon v. Legg*, supra, 68 Cal.2d 728, 739), but a court's task – in determining "duty" – is not to decide whether a particular plaintiff's injury was reasonably foreseeable in light of a particular defendant's conduct, but rather to evaluate more generally whether the category of negligent conduct at issue is sufficiently likely to result in the kind of harm experienced that liability may appropriately be imposed on the negligent party. The jury, by contrast, considers "foreseeability" in two more focused, fact-specific settings. First, the jury may consider the likelihood or foreseeability of injury in determining whether, in fact, the particular defendant's conduct was negligent in the first place. Second, foreseeability may be relevant to the jury's determination of whether the defendant's negligence was a proximate or legal cause of the plaintiff's injury.

*Id.*[14]

## 2. Whether Union Pacific Owes a Duty of Care that May Include a Duty to Install Fences or Gates[15]

Prior to *Rowland v. Christian*, decided in 1968, "it was generally settled throughout the country that railroads had no duty to fence access to their tracks in order to prevent injury to unauthorized entrants. . . ." *Silva v. Union Pacific R.R. Co.*, 85 Cal. App. 4th 1024, 1027 (2000) (citing *Holland v. Baltimore & O.R. Co.*, 431 A.2d 597, 603 n. 11 (App. D.C. 1981); *Joslin v. Southern Pac. Co.*, 189 Cal. App. 2d 382, 387-388 (1961)). In *Silva*, however, the court noted that it had "found no authority subsequent to *Rowland* holding that a railroad has no duty as a matter of law to fence its tracks." *Id.* at 1029. The court went on to reverse the trial court's holding, on a motion in limine, that there was no duty to fence, finding that the court had improperly made the determination in an "evidentiary void." *Id.* The court did not purport to resolve the question of

---

[14] CACI No. 1001, entitled "Basic Duty of Care," illustrates the jury's role in considering foreseeability, instructing the jury to determine whether the defendant used reasonable care, some of the factors that may be considered are "the likelihood  that someone would come on to the property in the same manner as [the plaintiff] did," "the likelihood of harm," "the probable seriousness of the harm" and whether the defendant "knew or should have known of the condition that created the risk of harm."  Other factors jurors may consider in determining whether a landowner used reasonable care are "[t]he difficulty of protecting against the risk of such harm" and "[t]he extent of [the defendant's] control over the condition that created the risk of harm."  *Id.*
[15] In their Opposition brief, Plaintiffs concede that "an absolute duty to fence off every inch of Union Pacific's tracks may not exist", but contend Union Pacific "had [a] duty to take reasonable steps to prevent [injury to others], which includes adding some fencing and warning signs at specific locations."  Opposition at 29.  Thus, the Court treats Plaintiffs' Premises Liability Claims as being based on two discrete duties:  the duty to install *some* fencing and/or gates and the duty to warn.

United States District Court
Northern District of California

whether (and under what circumstances) an owner of land containing a railroad right-of-way might have a duty to fence access to the tracks.  Further, while one decision cited by Plaintiffs suggest in dicta that such a duty to might exist, *see Perez v. Southern Pac. Trans. Co*., 218 Cal. App. 3d 462, 471 (1990), the Court finds no California case that provides significant guidance on this issue.  Thus, the Court must decide whether, with respect to the installation of some fencing or gates at locations like to the one in this case, it should depart from the general rule that a landowner owes a duty to use reasonable care to protect individuals on the land from dangerous conditions that could reasonably be expected to harm them.  Based on its consideration of the *Rowland* factors, the Court concludes that such a departure is not warranted.

        a.   Foreseeability and Connection Between Plaintiffs' Injury and Union Pacific's Conduct

In addressing foreseeability, the Court must consider whether "the category of negligent conduct at issue is sufficiently likely to result in the kind of harm experienced that liability may appropriately be imposed on the negligent party."  *Ballard v. Uribe*, 41 Cal. 3d at 572-573.[16]  This determination turns not only on whether a particular type of injury can, in some objective sense, be foreseen.  As the California Supreme Court has noted, "[o]n a clear day, you can foresee forever." *Sturgeon v. Curnutt*, 29 Cal.App. 4th 301, 306 (1994) (quoting *Thing v. La Chusa*, 48 Cal.3d 644, 668 (1989)).  Rather, courts must also consider social policy, which "must at some point intervene to delimit liability even for foreseeable injury."  *Parsons v. Crown Disposal Co*., 15 Cal. 4th 456, 476 (quoting *Borer v. American Airlines, Inc.*, 19 Cal. 3d 441, 446 (1977)).  This second consideration is captured in the requirement that foreseeability must be subjectively reasonable. *See Sturgeon*, 29 Cal.App. 4th  at 306.  This requirement is intended to "bring imposition of duty in line with practical conduct."  *Id*.

---

[16]Because the foreseeability of the harm and the closeness of the connection between the negligence and the harm "are two sides of the same coin," the Court addresses them together as essentially the same issue.  *See Bryant v. Glastetter*, 32 Cal.App.4th 770, 781 n. 2 (1995) (explaining that these two factors are essentially the same  because "[t]he general test of whether an independent intervening act, which operates to produce an injury, breaks the chain of causation is the foreseeability of that act").

United States District Court
Northern District of California

United States District Court
Northern District of California

1    Thus, for example, in *Pineda v. Ennabe*, the court held that a landlord did not have a duty

2    to place warnings on window screens where the plaintiff, a minor child, was injured when she fell

3    out of a second floor window through the screen.  61 Cal. App. 4th 1403, 1408 (1998).   The court

4    declined to find a duty to warn on the part of the landlord, even though "a landlord arguably may

5    foresee that his tenants might carelessly leave their small children unattended and exposed to

6    dangers."  *Id*.  The court reasoned that "[c]ommon sense and good policy militate against

7    requiring landlords to provide a safety net to reduce risks fundamentally caused by careless

8    parents."  *Id*.  Similarly, the court in *Edwards* refused to find a duty on the part of the owner of a

9    stadium to an individual who was intoxicated and was injured when he climbed a chest-high

10   stadium fence and fell to pavement below.  206 Cal. App. 3d at 1288.  Again, the court based its

11   holding, in part, on policy considerations, stating that "[t]here is a limit as to how far society

12   should go by way of direct governmental regulation of commercial and private activity, or indirect

13   regulation thereof through the tort system, in order to protect individuals from their own stupidity,

14   carelessness, daring or self-destructive impulses."  *Id*.

15   Here, the Court looks to the existing conditions at the site of the incident to determine

16   whether it was foreseeable that Union Pacific's conduct would lead to the type of injury that

17   occurred in this case.  In an objective sense, there is significant evidence that an accident of this

18   type was likely to occur at the location where it did. Most significantly, Plaintiffs have presented

19   evidence that there was a worn path crossing the tracks that Mr. Carter likely used to get from the

20   parking lot to the nature area on the other side of the tracks.[17]  As discussed above, California

21   common law recognized that such a path is an indication of constant use that gives rise to a duty of

22   due care because it puts the landowner on notice that individuals are crossing the tracks at that

23   location, making the possibility of harm to those individuals foreseeable.  The same logic applies

24   under *Rowland*.  Further, in addition to the evidence of the path itself, there is evidence (which

25   appears to be uncontroverted) that the path was connected to trails on either side of the tracks that

26

27   [17] Although Defendants have objected to the satellite images of the path, they have not offered any
     evidence to counter Mrs. Carter's testimony that there was a worn path that crossed the tracks at
28   the time of the relevant events.  Nor have they offered any evidence of their own suggesting that
     the path did not exist at the time of the incident.

United States District Court
Northern District of California

1    ran adjacent to the tracks, connecting a family recreation center –including playing fields and a

2    parking lot– with a nature area.

3    These paths and trails should have put Union Pacific on notice that individuals were

4    crossing the tracks and walking along the tracks in this area on a regular basis.  Indeed, there is

5    evidence that these trails and paths were subject to frequent use by adults, children and people

6    walking dogs.  Mrs. Carter testified that people frequently walked in this area and engineer Lobato

7    testified that he had seen people walking in this area approximately 50 times.  This evidence is

8    sufficient to show that it was objectively foreseeable that individuals who used the nature area and

9    the sports complex on the other side of the tracks would use the worn path crossing the tracks and

10   the paths adjacent to the tracks and that they could be injured by passing trains. [18]

11   Nor is the Court persuaded that foreseeability should be limited on the basis that it is

12   subjectively unreasonable.  As discussed above, courts may decline to impose a duty, even where

13   the injury is objectively foreseeable, in cases where the conduct of the category of individuals at

14   issue significantly contributed to the injury, such in *Pineda* or *Edwards*.  Here, however, the

15   category of individuals likely to be injured is simply those who use the trails and well-worn path

16   connecting the sports complex and the nature center.  There is nothing unreasonable, as a matter of

17   social policy, about finding that such individuals are owed a duty of care.[19]

18   Thus, the Court finds that the foreseeability factor, which is the most important factor for

19   determining whether there is a duty under *Rowland*, points to the existence of a duty to take

20

21   [18] The Court does not rely on the parties' evidence relating to the number of reported trespassers in
     this area because there is evidence in the record that trespassers often were not reported.  In

22   addition, with respect to the figures offered by Plaintiffs, it appears that some of the reported
     trespassing incidents did not occur in the limited geographical area that is the subject of this case,

23   at approximately MP 33.23 to approximately MP 34

24   [19] The Court is cognizant of the fact that this conclusion is dictated, in part, by the manner in
     which it has framed the inquiry.  In particular, it has defined the category of individuals to whom a

25   duty is owed as those who walk on the trails and paths that connect the sports complex with the
     nature area.  Defendants contend the inquiry should focus more narrowly on the facts of this case,

26   asking whether it was foreseeable that an individual walking an unleashed dog along the tracks
     (and who chose to go back to the tracks to rescue the dog from an approach train) would be hit by

27   a train. Framed in this manner, the issue of subjective reasonableness is a much closer call.  Based
     on the discussion in *Uribe*, however, the Court concludes that these specific facts relating to Mr.

28   Carter's death are more appropriately addressed by a jury.  Thus, despite the Court's finding that
     the foreseeability of this type of accident supports the imposition of a duty, a jury may still find
     that under the specific facts of this case it was *not* foreseeable that Mr. Carter would be hit.

United States District Court
Northern District of California

1   reasonable measures, which may include installing fencing or gates of some sort, to prevent harm

2   to individuals like Mr. Carter who regularly walk along the trails and paths in the area where the

3   incident occurred.

          **b.   Degree of Certainty of Injury to Plaintiffs**

5        Defendants do not dispute that Mr. Carter's death indicates that there was a high degree of

6   certainty of injury as a result of Union Pacific's conduct.

          **c.   Whether Conduct Was Morally Blameworthy**

8        "To avoid redundancy with the other *Rowland* factors, the moral blame that attends

9   ordinary negligence is generally not sufficient to tip the balance of the *Rowland* factors in favor of

10   liability." *Adams v. City of Fremont*, 68 Cal. App. 4th 243, 270 (1998).  Courts have found that

11   this factor favors the imposition of a duty "where the defendant (1) intended or planned the

12   harmful result  . . . ; (2) had actual or constructive knowledge of the harmful consequences of their

13   behavior . . . ;  (3) acted in bad faith or with a reckless indifference to the results of their conduct

14   . . . ;  or (4) engaged in inherently harmful acts  . . . ." *Id*.  Here, the Court does not find evidence

15   that establishes moral blameworthiness on any of these grounds.  There is nothing inherently

16   wrong with operating a train over tracks that pass near a nature area used by some to walk their

17   dogs. *See Abboud*, Case No. C-02-4140 VRW, Docket No. 44 at 14 (citing *Scott v. Chevron USA*,

18   5 Cal. App. 4th 510, 517 (1992)).  Further, Union Pacific has presented evidence that its Police

19   Department employed special agents to remove trespassers from its rights of way and that Union

20   Pacific also engaged in public outreach "dealing with the issue of trespassing on railroad

21   property." Bray Decl., ¶ 4.  Thus, this factor does not "tip the balance" in favor of finding a duty

22   under *Rowland*.

          **d.   Burden on Union Pacific and the Public**

24        The fifth *Rowland* factor requires the Court to consider the burden that would be imposed

25   on Defendants and the community if the Court were to find a duty to fence.  Neither Plaintiffs nor

26   Defendants have presented much evidence on this point.  Defendants contend the burden of

27   finding a duty to fence will be extreme because they would have to fence off  "every portion of its

28   thousands of miles of track," which would require "nearly infinite resources."  Motion at 11.  It is

United States District Court
Northern District of California

true that prior to *Rowland*, at least one California court found that the imposition of a duty to fence off the entire right-of-way would place an "unreasonable if not an intolerable burden" on landowners because such a duty would require them to install fencing along "hundreds of miles of right-of-way in California." *Joslin v. Southern Pac. Co.*, 189 Cal.App.2d 382, 389 (1961). Plaintiffs do not assert, however, that Defendants have a duty to fence the entire right-of-way; rather, they assert that the danger posed by trains travelling through areas such as the one here, where there is a worn path crossing the tracks and regular use by pedestrians, can be addressed through the strategic installation of gates and limited fencing to block access to the paths.  While expensive (Plaintiffs have offered evidence that the cost of wrought iron fencing is between $70.00 to $100.00 per linear square foot), there is no evidence in the record to suggest that such a duty would require "limitless resources," as Defendants contend. On this very limited record, the Court concludes that the burden of finding a limited duty to install some gates and fencing in locations like the one where Mr. Carter was struck to block access to the paths and trails does not impose such an intolerable burden that it outweighs the foreseeability of harm to people like Mr. Carter that points in favor of finding such a duty.[20]

### e.  Prevention of Future Harm

As to whether  a duty to fence would advance the policy of preventing harm such as occurred in this case, Defendants do not appear to dispute that at appropriate locations, at least, fencing can reduce problems with trespassing on the tracks (such as near a football stadium).  In the face of a worn path and evidence that pedestrians are crossing the tracks in the area where the incident occurred, the installation of strategically placed fences and gates making it more difficult to access the paths in such areas may prevent future harm.[21]

### f.  Insurance

In *Rowland*, the court examined whether the imposition of a duty would "materially reduce

---

[20] This conclusion does not preclude the introduction of evidence on burden at trial.
[21] Again, this conclusion does not preclude the introduction of evidence addressing the effectiveness of fences and gates or the difficulty of protecting against the risk of pedestrians like Mr. Carter from being struck by a train using fences and gates.  *See* CACI No. 1001(f).

the prevalence of insurance of insurance due to increased cost or even substantially increase the

cost." 69 Cal. 2d at 118.  Here, Plaintiffs have pointed out that Union Pacific is self-insured, but

they have offered no evidence regarding the impact that imposition of a duty would have on

Defendants with respect to the cost or availability of insurance.  On the other hand, Defendants do

not contend the imposition of a duty in this case will affect either the cost or availability of

insurance.  Therefore, this factor does not strongly weigh either for against the finding of a duty

under the circumstances of this case.

### g.   Conclusion

Considering all of the *Rowland* factors, the Court rejects Defendants' assertion that they

are entitled to summary judgment on Plaintiffs' premises liability claim on the ground that there is

no duty to fence as a matter of law.

### 3.   Duty to Warn

Defendants contend there was no duty to warn as a matter of law because the danger of

being hit by an approaching train is obvious to a person who is walking on or near the tracks in

areas like the one where Mr. Carter  was walking.  The Court agrees.

California courts have recognized that a landowner may owe a duty under *Rowland* to take

reasonable measures to remedy a dangerous condition where it is foreseeable that a person on the

premises will be harmed  – even where the danger condition is obvious.  *See Osborn v. Mission*

*Ready Mix*, 224 Cal.App.3d 104, 119 (1990).  However, the obviousness of the danger may negate

the duty to warn.  *Id*.  Thus, for example, in *Christoff v. Union Pacific R. Co*., the plaintiff was

injured when he walked on a narrow metal grid on a railroad bridge that ran next to the tracks;

after he was already on the bridge, a train approached and knocked him off, resulting in serious

injury to the plaintiff.    *Id*. at 126-127. The court pointed to the plaintiff's admission that he

"knew it would be hazardous to be on the bridge the same time as a train," and further noted that

the plaintiff had "observed the narrowness of the grid area."  *Id*.  The court found that "[a]ny

reasonable person would know that standing within a few feet of a high speed freight train is

dangerous."  *Id*. (citation omitted).   Therefore, the court found that the general rule – that "an

owner or possessor of land owes no duty to warn of obvious dangers on the property" – applied

United States District Court
Northern District of California

1    and that the railroad owed no duty to the plaintiff in that case.  *Id*.

2          The Court finds the reasoning of *Christoff* persuasive and reaches the same conclusion

3    here.  The danger to Mr. Carter of walking along railroad tracks where high-speed trains run on a

4    regular basis (or to any pedestrians walking on or near the tracks in this area) was obvious.  While

5    his death was tragic, under the circumstances here, Union Pacific owed no duty to warn.

6          **C.    Claims Against Amtrak[22]**

7                **1.   Whether Negligence Claims are Preempted**

8                     a.   Legal Standards Governing Preemption under the FRSA

9          The Supremacy Clause to the United States Constitution provides that "the Laws of the

10   United States . . . shall be the supreme Law of the Land," Art. VI, cl.2, and gives Congress the

11   power to preempt state law.  *Radici v. Associated Ins. Companies*, 217 F.3d 737, 741 (9th Cir.

12   2000).  Whether a state law is preempted is "almost entirely a question of Congressional intent."

13   *Id*. (citing *California Fed. Sav. & Loan Ass'n v. Guerra*, 479 U.S. 272, 280 (1987) (plurality

14   opinion)).  "Preemption occurs when Congress expresses a clear intent to occupy a particular

15   field."  *Michigan Southern R.R. Co. v. City of Kendallville, IN*, 251 F.3d 1152, 1153 (2001).  "In

16   the interest of avoiding unintended encroachment on the authority of the States, however, a court

17   interpreting a federal statute pertaining to a subject traditionally governed by state law will be

18   reluctant to find preemption" and will only find that state law is preempted where it is "'the clear

19   and manifest purpose of Congress.'"  *Easterwood*, 507 U.S. 658, 663-664 (1993) (quoting *Rice v.*

20   *Santa Fe Elevator Corp*., 331 U.S. 218, 230 (1947)).

21          The Federal Rail Safety Act of 1970 ("FRSA") was enacted "to promote safety in every

22   area of railroad operations and reduce railroad-related accidents and incidents."  49 U.S.C. §

23   20101.  Under the FRSA, the Secretary of Transportation has the authority to "prescribe

24   regulations and issue orders for every area of railroad safety supplementing laws and regulations

25

26   _____

27   [22] In the Motion, Amtrak asserts it is entitled to summary judgment on the Premises Liability Claims (based on breach of duty to fence and breach of the duty to post warning signs) because it does not own the land at issue in the case.   At oral argument, Plaintiffs stipulated that they are not asserting these claims against Amtrak.  Therefore, the Motion is GRANTED as to the Premises Liability Claims to the extent they are asserted against Amtrak.

28

United States District Court
Northern District of California

in effect on October 16, 1970." 49 U.S.C. § 20103(a).   The FRSA further provides that "[l]aws,

regulations, and orders related to railroad safety and laws, regulations, and orders related to

railroad security shall be nationally uniform to the extent practicable."  49 U.S.C. § 20106(a)(1);

*see also Union Pacific R.R. Co. v. California Public Util. Comm'n*, 346 F.3d 851, 858 (9th Cir.

2003).  This provision does not preempt all state law claims; to the contrary, subsection (a)(2)

provides that "[a] state may adopt or continue in force a law, regulation or order related to railroad

safety or security until the Secretary of Transportation (with respect to railroad safety matters), or

the Secretary of Homeland Security (with respect to railroad security matters), prescribes a

regulation or issues an order covering the subject matter of the State requirement."  49 U.S.C. §

20106(a)(2).  It further permits states to "adopt or continue in force an additional or more stringent

law, regulation, or order related to railroad safety or security" to "eliminate or reduce an

essentially local safety or security hazard."  49 U.S.C. § 20106(a)(2)(A).

　　　In 2007, Congress amended the provision to add a "[c]larification regarding State law

causes of action."  49 U.S.C. § 20106(b).  Subsection (b) provides, in part, as follows:

> (1) Nothing in this section shall be construed to preempt an action
> under State law seeking damages for personal injury, death, or
> property damage alleging that a party--
>
> (A) has failed to comply with the Federal standard of care
> established by a regulation or order issued by the Secretary of
> Transportation (with respect to railroad safety matters), or the
> Secretary of Homeland Security (with respect to railroad security
> matters), covering the subject matter as provided in subsection (a) of
> this section;
>
> (B) has failed to comply with its own plan, rule, or standard that it
> created pursuant to a regulation or order issued by either of the
> Secretaries; or
>
> (C) has failed to comply with a State law, regulation, or order that is
> not incompatible with subsection (a)(2).

49 U.S.C. § 20106(b)(1).  This amendment was enacted in response to Federal court decisions that

followed a train accident in Minot, North Dakota in which courts had found preempted tort claims

based on alleged violations of federal regulations and/or the railroad's own internal rules.  *See*

*Zimmerman v. Norfolk Southern Corp.*, 706 F.3d 170, 177 (3d Cir. 2013) (quoting conference

1    report stating that the goal of the 2007 amendment was to "rectify the Federal court decisions

2    related to the Minot, North Dakota accident that are in conflict with precedent." (H.R. Rep. No.

3    110-259, at 351 (2007), *reprinted in* 2007 U.S.C.C.A.N. 119, 183).

4         Thus, under the FRSA, preemption analysis involves a two-step inquiry.  *Id*. at 178.  First,

5    the court asks "whether the defendant allegedly violated either a federal standard of care or

6    internal rule that was created pursuant to a regulation."  *Id*. (citing 49 U.S.C. § 20106(b)(1)(A) –

7    (B)).  If the answer is yes, the claim is not preempted.  *Id*.  Otherwise, the court moves to the

8    second step and asks whether any federal regulation covers the plaintiff's claim and therefore

9    preempts the claim.  *Id*. (citing 49 U.S.C. § 20106(a)(2)).

10        In *Easterwood*, the Court addressed the circumstances under which a regulation will be

11   considered to "cover" a state law claim under the FRSA, finding as follows:

12              To prevail on the claim that the regulations have pre-emptive effect,
              petitioner must establish more than that they "touch upon" or "relate
13            to" that subject matter, *cf. Morales v. Trans World Airlines, Inc.*,
              504 U.S. 374, 383-384, 112 S.Ct. 2031, 2037, 119 L.Ed.2d 157
14            (1992) (statute's use of "relating to" confers broad pre-emptive
              effect), for "covering" is a more restrictive term which indicates that
15            *pre-emption will lie only if the federal regulations substantially
              subsume the subject matter of the relevant state law*. See Webster's
16            Third New International Dictionary 524 (1961) (in the phrase
              "policy clauses covering the situation," cover means "to comprise,
17            include, or embrace in an effective scope of treatment or
              operation"). The term "covering" is in turn employed within a
18            provision that displays considerable solicitude for state law in that
              its express pre-emption clause is both prefaced and succeeded by
19            express saving clauses.

20   507 U.S. at 664 (emphasis added);  *see also, Zimmerman*, 706 F.3d at 178 (concluding that in

21   enacting the 2007 amendment, Congress did not intend to legislatively overrule cases that predate

22   the amendment, including *Easterwood*, as to this aspect of the preemption analysis).

23

24        b.   Failure to Slow/Excessive Speed Claim

25        Under the standards articulated above, it is clear that a claim based simply on excessive

26   speed would be preempted in this case because it is undisputed that at the time of the incident the

27   train was not exceeding the speed limit set by federal regulation for the relevant stretch of track.

28   *See* JSUMF Nos. 6, 7.  Indeed, in *Easterwood*, the Court found that just such a claim was

United States District Court
Northern District of California

United States District Court
Northern District of California

1    preempted by federal regulations setting speed limits.  507 U.S. at 675.  In a footnote, however,

2    the *Easterwood* Court recognized that the preemption of the plaintiff's excessive speed claim

3    likely did not "bar suit for breach of related tort duties, such as the duty to slow or stop a train to

4    avoid a specific, individual hazard." *Id*. at 675 n. 15.  That is exactly the claim Plaintiffs assert

5    here against Amtrak. [23]  For the reasons stated below, the Court concludes that Plaintiffs' claim for

6    failure to slow or stop the train to avoid hitting Mr. Carter is not preempted by the FRSA.

7         Courts that have addressed *Easterwood*'s exception to preemption for specific, individual

8    hazards have found that "a specific, individual hazard must be something out of the ordinary,"

9    *Liboy v. Rogero*, 363 F. Supp. 2d 1332, 1340 (citing *Wright v. CSX Trans. Inc*., 375 F.3d 1252,

10   1259 (11th Cir. 2004)), and "logically relates to the avoidance of a specific collision." *Beausoleil*

11   *v. National R.R. Passenger Corp*., 145 F.Supp.2d 119, 121 (D.Mass., 2001) (quoting *Armstrong v.*

12   *Atchison, Topeka & Santa Fe Railway Company*, 844 F. Supp. 1152, 1153 (W.D. Tex. 1994)).

13   Courts have interpreted the exception narrowly to exclude claims that are based on conditions that

14   arise on a regular basis or are found statewide because such hazards are "capable of being

15   adequately encompassed within uniform national standards."  *Id*. (quoting *O'Bannon v. Union*

16   *Pacific R.R. Co.*, 960 F. Supp. 1411, 1421 (W.D. Mo. 1997)).  Thus, for example, courts have

17   found that in general, adverse weather conditions do not constitute a specific, individual hazard

18   under *Easterwood*.  *See Seyler v. Burlington Northern Santa Fe Corp*., 102 F.Supp.2d 1226, 1236-

19   1237 (D.Kan., 2000).  Similarly, "knowledge of a chronically dangerous condition, such as the

20   knowledge that disembarking passengers often illegally cross[ ] the tracks" at a particular station

21   has been found to be insufficient to avoid preemption.  *Beausoleil*, 145 F. Supp. 2d at 121.

22   Rather, "[i]t has been consistently emphasized that the kinds of conditions that could constitute a

23   'specific individual hazard' are limited to transient conditions that could lead to an imminent

24   collision, such as a child standing on the railway or a motorist stranded on a crossing or

25   improperly parked tank cars which obstruct the view of the train engineer." *Baker v. Canadian*

26

27   [23] At oral argument, Plaintiffs stipulated that their claim for failure to slow is *not* based on the
     theory that the Amtrak train was travelling at an excessive speed in light of the conditions that
28   existed along that stretch of track, that is, that the crew should have been *prepared* to stop because
     of the likelihood that a pedestrian might cross the tracks in this area.

United States District Court
Northern District of California

1    *Nat.l/Illinois Cent. Railway Co*., 397 F.Supp.2d 803, 814 (S.D.Miss., 2005) (citation omitted).

2            Here, Plaintiffs' failure to slow claim is based on a specific, unique situation, namely, a

3    man and his dogs that the crew saw approximately a quarter mile away on or near the tracks.

4    Although Defendants assert that the claim is preempted until the moment Mr. Carter went back to

5    the tracks to save one of the dogs, the Court does not find any authority to suggest such a narrow

6    reading of this exception.  The undisputed testimony of both Lobato and Battles was that they

7    were aware of Mr. Carter and his dogs (at least some of the dogs) even before they reached the

8    Stevenson Crossing.   Although both saw Mr. Carter leave the track, neither testified that they

9    believed that Mr. Carter was in a position of safety when he briefly got off the tracks before

10   returning to retrieve his dog. [24]  Nor does it appear from the Locomotive Video that Mr. Carter

11   *was* in a position of safety.[25]  Further, according to Defendants' version of events, the crew

12   interrupted the crossing sequence to sound the emergency horn *before* Mr. Carter returned to the

13   tracks, indicating they believed that there was a possibility of an imminent collision even when

14   Mr. Carter briefly got off the tracks.  *See* Motion at 4 (stating that Mr. Carter returned to the tracks

15   3 seconds before impact (citing Heikkila Decl., Ex. A (Heikkila Report), §§ 3.2, 3.7, Locomotive

16   Video and Event Recorder); Reply at 16 n. 12 (citing Event Recorder Data Table) in support of

17   assertion that emergency horn was sounded "at least 6 seconds before impact").  This is the sort of

18   unique situation that is not capable of being regulated by uniform standards and therefore is not

19   preempted by the FRSA.

20           The Court's conclusion is consistent with the general rule that "a railroad is not liable for

21   failure of its train to slow or stop simply because a pedestrian or a vehicle approaches a track

22

23   ───────────────

24   [24] At oral argument, Defendants stated that Lobato and Battles testified that Mr. Carter was in a
     "position of safety."  This overstates the testimony.  Lobato testified that he saw that Mr. Carter

25   was "clear of the tracks" at some point, *see* Fiore Decl., Ex. 3 (Lobato Dep.) at 34, while Battles
     testified  that at some point he saw Mr. Carter "move from between the rails."  *Id*., Ex. 7 (Battles

26   Dep.) at 58.  Neither testified as to how far off the tracks Mr. Carter was or that they believed Mr.
     Carter was in a "position of safety."
     [25] Although no evidence is offered as to precisely how far off the track Mr. Carter was before he

27   returned to save his dog, it is undisputed that he was not 25 feet or more from the track – what
     Operation Lifesaver  defines as a "safe distance" from the track.  Hughes Decl., Ex. 3 (Operation

28   Lifesaver Brochure). Rather, at oral argument Defendants asserted that Mr. Carter was likely "at
     least five feet" off the tracks.

1    ahead." *Id.* (quoting *Florida E. Coast Ry.v. Griffin*, 566 So.2d 1321, 1324 (Fla. 4th DCA 1990)).

2    Mr. Carter was not merely approaching the tracks, which is a common event.  Rather, he was

3    actually on or very near the track and had at least one unleashed dog that apparently did not get off

4    the track.  This was not an ordinary situation, either when the crew first spotted Mr. Carter or later

5    when he returned to the tracks.  It was a situation that could cause an imminent collision and of

6    which the crew was aware.  Therefore, the Court concludes that Plaintiffs' claim based on

7    negligent failure to stop is not preempted, even for the period *before* the point when Mr. Carter

8    returned to the tracks for his dog.

9                          c.   Negligent Training and Supervision Claims

10          As discussed above, under the FRSA, a state law claim that is covered by a federal

11   regulation is preempted *unless* the claim is based on an alleged violation of either a federal

12   regulation that establishes a standard of care or an internal rule that was created pursuant to a

13   regulation.  *See* 49 U.S.C. § 20106(a) & (b).  Plaintiffs do not dispute that their training and

14   supervision claims are covered by FRA regulations requiring that Defendants have a program for

15   training and certifying engineers.  Instead, they contend these regulations set the applicable

16   standard of care and therefore, that the claims are not preempted.  The Court rejects Plaintiffs'

17   position because they have not identified any specific standard of care that is violated by the

18   alleged conduct.

19          In their complaint, Plaintiffs allege generally that Defendants "negligently trained or

20   negligently failed to train the engineer and other members of the crew," FAC ¶ 49, and that they

21   "violated statutory duties in their training of the engineer and other members of the crew," FAC  ¶

22   57.  They do not identify any specific statutory provision in support of this allegation.  Nor do they

23   cite any federal regulations that were purportedly violated with respect to training and supervision.

24   In their Opposition brief, however, Plaintiffs cite the following regulations they claim were

25   violated:  49 C.F.R. § 240.127(b)[26]; 49 C.F.R. § 240.129(b)[27]; 49 C.F.R. § 217.9(a)[28]; 49 C.F.R. §

26   

27   [26] 49 C.F.R. § 240.127(b) provides that "[a] railroad shall have procedures for examining the
     performance skills of a person being evaluated for qualification as a locomotive engineer in either

28   train or locomotive service to determine whether the person has the skills to safely operate
     locomotives and/or trains, including the proper application of the railroad's rules and practices for

United States District Court
Northern District of California

217.11(a)[29]; and 49 C.F.R. § 218.11.[30]

Plaintiffs assert generally that there is evidence sufficient to show a material dispute of fact that the federal standard of care established in these regulations was violated based on evidence that: 1) Lobato was involved in training Amtrak engineers, including Battles (whose only in-field training was provided by Lobato), even though he had hit at least 10-15 pedestrians in the seven years before he was hired by Amtrak; 2) Lobato and Battles were not trained by Amtrak on how to handle situations where they saw pedestrians or animals on the tracks; 3) Lobato was not tested for drugs or alcohol after he struck Mr. Carter; 4) Lobato did not recall a rule requiring that he apply the emergency brake without hesitation if life or property were in danger;  5) Lobato and Battles were not instructed on the length of the short and long horn blasts or the duration of the sequence required when trains approach crossings; 6) Lobato was not instructed on how to sound the series of short blasts provided for in emergency situations under GCOR Section 5.8.2; 7) Battles had struck a pedestrian but had not been disciplined and Battles had never heard of any engineer being disciplined for striking a pedestrian; 8) Amtrak's training of engineers does not include training them to report unsafe conditions such as trespassers near the tracks and Amtrak does not know if Lobato or Battles ever received training about the requirements for reporting trespassers.  *See* Opposition at 27-28. Plaintiffs do not link any of the evidence they cite in support of this claim to

---

the safe operation of locomotives or trains, in the most demanding class or type of service that the person will be permitted to perform."

[27] 49 C.F.R. § 240.129(b) provides that "[a] railroad shall have procedures for monitoring the operational performance of those it has determined as qualified as a locomotive engineer in either train or locomotive service").

[28] 49 C.F.R. § 217.9(a) provides that "[e]ach railroad to which this part applies shall periodically conduct operational tests and inspections to determine the extent of compliance with its code of operating rules, timetables, and timetable special instructions, specifically including tests and inspections sufficient to verify compliance with the requirements of subpart F of part 218 of this chapter, in accordance with a written program as required by paragraph (c) of this section."

[29] 49 C.F.R. § 217.11(a) provides that "[t]o ensure that each railroad employee whose activities are governed by the railroad's operating rules understands those rules, each railroad to which this part applies shall periodically instruct each such employee on the meaning and application of the railroad's operating rules in accordance with a written program retained at its system headquarters and at the division headquarters for each division where the employee is instructed."

[30] 49 C.F.R. § 218.11 provides that "[t]he operating rules prescribed in this part, and any additional or more stringent requirements issued by a railroad in relation to the operating rules prescribed in this part, shall be subject to the provisions of Part 217 of this chapter, Railroad Operating Rules: Filing, Testing, and Instruction."

any *specific* federal standard of care, however, or explain how the evidence, if credited by the jury, would establish a violation of such a standard. Therefore, the Court finds that this claim is preempted by the FRSA and the FRA regulations.

> d.   Negligent Horn Operation Claims

As framed in the complaint, Plaintiffs' negligent horn operation claim was based on three theories: 1) the crew breached its duty to ensure that the horn of the train complied with the audibility requirements of 49 C.F.R. § 229.129 (setting a minimal sound level for locomotive horns of 96dB(A) at 100 feet forward of the locomotive in the direction of travel), *see* FAC ¶ 50; 2) the crew failed to comply with 49 C.F.R. § 222.21 (requiring use of long, long, short, long sequence prior to entering public crossing and, for locomotives travelling under 60 mph, that the sequence be initiated between 15 and 20 sequences before entering the crossing and be "repeated or prolonged until the locomotive occupies the crossing"), *see* FAC ¶ 51; and 3) the crew violated 49 C.F.R. § 222.23 by failing to properly sound the emergency horn as it approached Mr. Carter, *see* Opposition at 7.

Plaintiffs appear to have dropped the first theory, which is not addressed in their Opposition brief.  Therefore, the Court grants Defendants' request for summary judgment on this theory.  With respect to the emergency horn, Plaintiffs argued in their Opposition brief that the crew failed to sound the emergency horn.  *See*  Opposition at 6-8.  However, they did not respond to Defendants' argument (with which the Court agrees) that this claim is preempted because 49 C.F.R. § 222.23 gives the train engineer "sole discretion" as to when it is appropriate to sound the emergency horn and expressly provides that the regulation does not "impose a legal duty to sound the locomotive horn" in an emergency.  Therefore, this claim fails both due to Plaintiffs' failure to respond and on the merits. The only remaining claim is based on the crew's alleged failure to sound the proper horn sequence before entering the Stevenson crossing, in violation of 49 C.F.R. § 221.21.  The Court concludes that this claim is not preempted.

First, although the evidence is mixed as to the exact timing of the horn sequence, Amtrak all but concedes that Lobato did not sound the horn in compliance with the FRA regulation or the GCOR requirements for approaching a public crossing.  *See* Motion at 22 (citing Lobato testimony

United States District Court
Northern District of California

in support of assertion that the sequence for approaching the crossing was "cut short and turned into an emergency horn pattern due to Mr. Carter's presence near the track."). Defendants' expert, Heikkila, interprets the Event Data Recorder as showing that a "warning horn sequence" was initiated approximately 18 seconds before impact but does not address how many seconds before the crossing the sequence was initiated. Heikkila Decl., ¶ 5. Nor does he describe the duration of the individual blasts, or attempt to explain which individual blasts constituted the pre-crossing sequence (or even the beginning of that sequence, accepting Defendants' assertion that the sequence was interrupted). Plaintiffs' expert, on the other hand, opines based on the Event Data Recorder that "all of the horn blasts were less than a second long" and thus, that there was no long blast sounded. Byrnes Decl., ¶ 8. Byrnes also opines that the first blast was "a one-second blast," which was followed by 5 seconds of silence, then a second blast that was less than a second in duration. Byrnes Decl., ¶¶ 6-7. Just as the train approached the Stevenson Crossing, two more short blasts (lasting a total of one second) were sounded. *Id*. Based on this evidence – as well as the Locomotive Video itself – a jury could reasonably conclude that the train crew did not comply with the federal regulation and GCOR requirements regarding the proper sequence for approaching the crossing.

The Court rejects Defendants' argument that in citing evidence of the typical duration of long and short blasts, Plaintiffs are attempting to impose a separate standard of care and thus, that the claim is preempted. Even putting aside any evidence of how long a typical long or short horn blast might be (such as the testimony of a Union Pacific manager that an example of the sequence would be long blasts lasting 5 seconds and short blasts lasting 2 seconds, *see* Mathison Decl., ¶ 12 (citing Bryant Dep. at 20)), *none* of the blasts that was sounded was significantly longer than any other blast; nor have Defendants offered any evidence that, as a factual matter, any of the blasts that were sounded could be considered "long blasts" under any reasonable interpretation of the words "long" and "short" in the regulation. Indeed, as noted above, Defendants conceded at oral argument that all of the horn blasts sounded between the whistle board and the point of impact were short blasts. Defendants have cited no authority that persuades the Court that Congress intended to preempt common law claims based on standards set forth in FRA regulations merely

United States District Court
Northern District of California

1   because it might be necessary to introduce evidence regarding the meaning of the words used in

2   the regulations.  Further, were the Court to adopt Defendants' position, it would, in essence, be

3   holding that because the regulation does not define the exact duration of the long and short blasts,

4   any claim based on this regulation would be preempted so long as a series of blasts was sounded;

5   no matter the duration of any of the individual blasts, the defendant could arbitrarily characterize

6   them as "short" or "long" to establish that the sequence complied with the regulations.  That

7   conclusion, however, is not consistent with the 2007 amendment of the FRSA clarifying that

8   Congress intended to preserve state law claims that are based on enforcement of a federal standard

9   of care.

10          The Court also rejects Defendants' reliance on the fact that Mr. Carter was not struck at the

11   crossing itself but 508 feet beyond.  It is well-established that "a duty imposed by a statute may

12   not be the foundation for actionable negligence in the performance of that duty unless it is owed to

13   the person injured, or to a class of which he is a member, or stated another way, a violation of a

14   statute is actionable negligence only as to those persons for whose benefit or protection it was

15   enacted."  *Routh v. Quinn*, 20 Cal. 2d 488, 491-492 (1942) (citations omitted).   Here, however,

16   Defendants have pointed to nothing in the regulation or the legislative history that suggests that a

17   pedestrian just beyond a crossing is not in the class of people the regulation was designed to

18   protect.  Rather, given the broad purpose of the FRSA, to "reduce railroad-related accidents and

19   incidents," the Court concludes that an individual who is on or near the tracks just beyond the

20   crossing and who might have received sufficient warning to avoid being struck if the crossing

21   sequence had been sounded properly falls within the class of people the regulation is designed to

22   protect.

23          Accordingly, Plaintiffs' claim based on negligent horn operation survives summary

24   judgment to the extent it is based on Defendants' alleged failure to sound the proper sequence as

25   the train approached the Stevenson Crossing.

26              **2.   Prima Facie Case as to Negligent Lookout and Response to Specific Hazard**

27          As noted above, Plaintiffs' negligent lookout claim is the "flip side" of their claim for

28   negligent failure to slow.  While the Court finds that there is a fact question as to the latter claim,

54

United States District Court
Northern District of California

1    the Court agrees with Defendants that Plaintiffs have not made a prima facie case as to their

2    negligent lookout claim.  The undisputed evidence shows that both Lobato and Battles saw Mr.

3    Carter well before they struck him.  There is no evidence in the record that suggests the Amtrak

4    train struck Mr. Carter due to the crew's failure to maintain a proper lookout.  Accordingly,

5    Defendants are entitled to summary judgment as to the negligence claim based on failure to

6    maintain a proper lookout.

7        On the other hand, the Court rejects Defendants' assertion that Plaintiffs have failed to

8    make a prima facie case as to the negligence claim based on failure to slow. Defendants' argument

9    is based on the premise that the claim is preempted as to all but the last few seconds before

10    impact; at that point, Defendants contend, there was nothing that could have been done that would

11    have changed the outcome.  As the Court has rejected the underlying premise, however,

12    Defendants' argument that Plaintiffs have not made a prima facie case as to their failure to slow

13    claim fails.  As there are material disputes of fact as to whether the accident might have been

14    avoided had the crew applied the emergency brake when it first saw Mr. Carter and his dogs, the

15    negligent failure to slow claim must be decided by a jury.

16    **IV.**    **CONCLUSION**

17        For the reasons stated above, the Motion is GRANTED in part and DENIED in part as

18    follows:  Plaintiffs' Premises Liability Claims against Amtrak are dismissed with prejudice

19    because Amtrak does not own or control the railroad right-of-way where the accident occurred.

20    As to Union Pacific, the Premises Liability claim based on failure to take preventive measures

21    such as installing gates or fencing survives summary judgment but the failure to warn does not, for

22    the reasons stated above.   The Court further holds that Plaintiffs' negligence claims against

23    Amtrak and Union Pacific based on negligent training and supervision are preempted by the

24    FRSA.   Plaintiffs' claims against Amtrak for negligence based on failure to slow in response to a

25    specific, individual hazard and for failure to sound the horn in compliance with GCOR and federal

26    regulations as the train approached the Stevenson Crossing survive summary judgment for the

27    reasons stated above.  Plaintiffs' negligence claim against Amtrak based on failure to maintain a

28    proper lookout is dismissed with prejudice because Plaintiffs have failed to point to evidence

sufficient to demonstrate a material dispute of fact as to that claim.

**IT IS SO ORDERED.**

Dated: August 8, 2014

_____
JOSEPH C. SPERO
United States Magistrate Judge